THE STATE OF OHIO, APPELLEE, *v.* HOFFNER, APPELLANT.

[*State v. Hoffner,* 102 Ohio St.3d 358, 2004-Ohio-3430.]

(No. 2001–0835—Submitted March 31, 2004—Decided July 14, 2004.)

LUNDBERG STRATTON, J.

{¶ 1} On September 22, 1993, Timothy L. Hoffner, defendant-appellant, and Archie Dixon kidnapped and robbed Christopher Hammer, then drove Hammer to a remote area where they buried him alive in a shallow grave and left him to die.

{¶ 2} Hoffner was convicted of the aggravated murder, aggravated robbery, and kidnapping of Hammer, and he was sentenced to death.

{¶ 3} Hoffner and Hammer met in August 1993. For a short period of time in mid-August 1993, Hoffner, Hammer, and Dixon lived at the Toledo home of Kirsten Wilkerson, Dixon's girlfriend.

{¶ 4} In early September 1993, Michael Elting, a friend of Hammer, Hoffner, and Dixon, borrowed Hammer's car, a 1987 Dodge Daytona, to go to the movies with Hoffner and Dixon. According to Elting, Hoffner and Dixon discussed "how to get rid of [Hammer's] car," and Hoffner said that he knew a place where he could take the car, presumably after Hammer was killed. Approximately one month after Hammer's disappearance, Elting discovered Hammer's car at a used car lot in Toledo.

{¶ 5} On the afternoon of September 21, Dixon told Wilkerson that he and Hoffner were going to "get [Hammer] tonight." Wilkerson understood this to mean that Dixon and Hoffner were going to kill Hammer.

{¶ 6} In the early morning of September 22, Hoffner, Dixon, and Hammer went to Wilkerson's house. Once there, Hoffner and Dixon attacked Hammer. Hoffner restrained Hammer in a headlock while Dixon beat him. Hoffner tried to break Hammer's neck, and Dixon struck Hammer in the head with a wine bottle. Hoffner and Dixon then tied Hammer to a bunk-bed ladder, and Dixon went through Hammer's wallet, taking out his money, birth certificate, and Social Security card. Then Hoffner and Dixon discussed how they should dispose of Hammer's body.

{¶ 7} While Hammer remained tied to the bunk-bed ladder, Hoffner and Dixon left Wilkerson's house to dig a grave. Hoffner and Dixon returned to Wilkerson's house and they, along with Wilkerson, drove Hammer, blindfolded, to the gravesite in Hammer's car. Wilkerson stayed at the car while Hoffner and Dixon walked Hammer into the woods, where they permitted Hammer to smoke a cigarette. Then they gagged and again blindfolded Hammer, tied his hands and feet behind his back, grabbed him by his arms and legs, and dropped him into the grave, still alive. At one point, Hammer was able to remove the gag from his mouth and free one of his legs. Hoffner jumped into the grave and placed his foot over Hammer's mouth when Hammer yelled for help. Hoffner and Dixon then held Hammer down and covered him with dirt. After Hammer was completely buried, Hoffner and Dixon walked back and forth across the grave, packing down the dirt. Hoffner, Dixon, and Wilkerson then returned to Wilkerson's house in Hammer's car.

{¶ 8} After killing Hammer, Hoffner and Dixon carried out their plan to sell his car. On September 25, Dixon obtained a state of Ohio identification card with his photograph but in Hammer's name. On September 30, Hoffner and Dixon went to the automobile title bureau, where Dixon obtained a duplicate certificate of title for Hammer's car using the fraudulent ID card. Hoffner and Dixon then took Hammer's car to a used car lot, where they sold the car for $2,800.

{¶ 9} By November 8, 1993, police officers investigating Hammer's disappearance had located his Dodge Daytona at a used car lot in Toledo, had confirmed its unauthorized sale on September 30, and had identified Dixon as the prime suspect in the vehicle transaction. On November 9, police went to Wilkerson's home and arrested Dixon for forgery. The police also executed a search warrant at Wilkerson's home. During the search, police questioned Hoffner regarding Hammer's disappearance. Hoffner denied involvement but made statements implicating Dixon. Hoffner agreed to accompany police detectives downtown to make a statement. On the way to the station, Hoffner told police that Dixon had shown him the location of Hammer's body, and he then led police to the gravesite.

{¶ 10} Once at the station, police read Hoffner his *Miranda* rights, but Hoffner was not placed under arrest. Hoffner waived his rights and gave a taped account of Dixon's involvement in Hammer's murder. After Hammer's body was discovered, Dixon confessed to Hammer's murder and also implicated Hoffner. Police subsequently arrested Hoffner on November 10 at his mother's home. At police headquarters, detectives read Hoffner his *Miranda* rights, and Hoffner signed a waiver-of-rights form. Hoffner then gave a taped statement confessing to his part in Hammer's death.

{¶ 11} Cynthia Beisser, Deputy Coroner of Lucas County, performed an autopsy and concluded that Hammer had died of asphyxiation. According to Dr. Beisser, Hammer likely died within five minutes of being buried alive, and he might have remained conscious during the first two to three minutes.

{¶ 12} A grand jury indicted Hoffner, Dixon, and Wilkerson for the aggravated murder, kidnapping, and aggravated robbery of Hammer. Hoffner was indicted on three counts of aggravated murder. Count One of the indictment charged Hoffner with aggravated murder involving prior calculation and design. R.C. 2903.01(A). Count Two charged Hoffner with aggravated murder while committing kidnapping, and Count Three charged Hoffner with aggravated murder while committing aggravated robbery, both pursuant to R.C. 2903.01(B). Hoffner was additionally indicted for kidnapping in Count Four, aggravated robbery in Count Five, and three counts of forgery in Counts Six, Seven, and Eight.

{¶ 13} The three counts of aggravated murder each contained two R.C. 2929.04(A)(7) death penalty specifications. The first specification charged aggravated murder during a kidnapping, and the second charged aggravated murder during an aggravated robbery.

{¶ 14} The jury convicted Hoffner as charged and recommended the death penalty. Thereafter, the trial court sentenced Hoffner to death for the murder, to ten to 25 years each for kidnapping and aggravated robbery, and to 18 months for each forgery charge. On appeal, the court of appeals affirmed Hoffner's convictions and death sentence.

{¶ 15} We previously upheld identical convictions and the death sentence for Dixon. See *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042.

I

Pretrial Issues

{¶ 16} In his first proposition of law, Hoffner claims that the trial court erred in failing to suppress various oral statements that he made to police before and after his arrest.

{¶ 17} On November 9, 1993, Hoffner and Dixon were living at Wilkerson's house. At approximately 11:00 a.m. on that date, Toledo police officers executed a search warrant at the Wilkerson residence and arrested Dixon for forgery.

{¶ 18} During the search, Lieutenant Charles Hunt discovered Hoffner covered with a blanket lying on a couch in the family room. Hunt, with his weapon drawn but pointed in the air, ordered Hoffner off the couch. Hunt then pulled the blanket away from Hoffner, holstered his weapon, and searched Hoffner for weapons. To prevent Hoffner from interfering while police searched the premises, Hunt asked Hoffner to sit in a nearby chair.

{¶ 19} Hunt and Detective Robert Leiter then searched the family room. During their search, the detectives asked Hoffner whether he knew anything about Hammer's disappearance. Hoffner denied all knowledge of Hammer's whereabouts.

{¶ 20} After Hunt and Leiter completed their search of the family room, Hoffner asked to speak with them. Hoffner told police that Dixon and Hammer had gotten into an argument and that Dixon had "[taken] care of him," had buried Hammer's body in the woods, and had sold Hammer's car. At no point did Hoffner implicate himself.

{¶ 21} Once Hoffner had implicated Dixon, Hunt and Leiter asked whether Hoffner would go downtown to make a statement. Hoffner agreed. On the drive to the police station, Leiter told Hoffner that officers would begin searching the wooded area where Hoffner had said Hammer's body was buried and that any other information Hoffner had would be helpful. Leiter again asked whether Hoffner had had anything to do with Hammer's disappearance, and Hoffner said he had not. Hoffner subsequently asked the detectives to stop the car and indicated that he had additional information but said he did not want to get into trouble. Leiter told Hoffner that he could be charged with obstruction if he withheld information, but if he told the truth and was not involved in any crimes, he had nothing to worry about. At that point, Hoffner told the detectives where they could find Hammer's body.

{¶ 22} After leading the detectives to Hammer's grave, Hoffner again agreed to go to the police station to give a statement. On the way to the station, the detectives stopped at a fast-food restaurant, and Hoffner was given food and a drink. At the station, Leiter advised Hoffner of his *Miranda* rights but did not arrest him. Hoffner confirmed that he understood his rights and signed a waiver-of-rights form. At approximately 3:30 p.m., Hoffner gave a taped statement describing Dixon's murder of Hammer. After the interview, Leiter and Detective Phil Kulakoski drove Hoffner back to Wilkerson's house. Hoffner then packed his belongings and drove himself to his mother's house in Perrysburg.

{¶ 23} At approximately 7:30 p.m. on November 9, Dixon confessed to Hammer's murder and, in the process, implicated Hoffner. Shortly thereafter, police obtained an arrest warrant for Hoffner. After midnight on November 10, Kulakoski and Leiter arrested Hoffner at his mother's house.

{¶ 24} Detectives drove Hoffner to the police station, where they again read him *Miranda* warnings. Hoffner signed a waiver-of-rights form and gave a taped statement confessing to Hammer's murder.

{¶ 25} Hoffner now contends that police should have given *Miranda* warnings to him prior to any questioning during his initial encounter with police at the Wilkerson residence. Hoffner argues that he was in custody because the

presence of detectives and uniformed officers during the execution of the search warrant presented a "coercive atmosphere." As a result, Hoffner submits that any statements he made during the search should have been suppressed. Hoffner further contends that all subsequent statements, including his confession, were inadmissible because they were tainted by the earlier *Miranda* violation.

{¶ 26} Contrary to Hoffner's argument, *Miranda* warnings are not required simply because the questioning takes place in a coercive atmosphere. See *Oregon v. Mathiason* (1977), 429 U.S. 492, 495, 97 S.Ct. 711, 50 L.Ed.2d 714 (a coercive environment does not automatically convert a noncustodial situation into one requiring *Miranda* warnings). The procedural safeguards identified in *Miranda* apply only when one is subjected to custodial interrogation. *Miranda v. Arizona* (1966), 384 U.S. 436, 478–479, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶ 27} *Miranda* defined "custodial interrogation" as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda*, 384 U.S. at 444, 86 S.Ct. 1602, 16 L.Ed.2d 694. In order to determine whether a person is in custody for purposes of receiving *Miranda* warnings, courts must first inquire into the circumstances surrounding the questioning and, second, given those circumstances, determine whether a reasonable person would have felt that he or she was not at liberty to terminate the interview and leave. *Thompson v. Keohane* (1995), 516 U.S. 99, 112, 116 S.Ct. 457, 133 L.Ed.2d 383. Once the factual circumstances surrounding the interrogation are reconstructed, the court must apply an objective test to resolve "the ultimate inquiry" of whether there was a " 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler* (1983), 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275, quoting *Oregon v. Mathiason*, 429 U.S. at 495, 97 S.Ct. 711, 50 L.Ed.2d 714.

{¶ 28} We hold that Hoffner was not in custody for *Miranda* purposes during the execution of the search warrant and that, therefore, he was not entitled to its protective warnings. When the search warrant was served, detectives informed Hoffner as to the reasons for the search and asked whether he knew anything about Hammer's disappearance. Such questioning does not require *Miranda* warnings. "General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding." *Miranda*, 384 U.S. at 477, 86 S.Ct. 1602, 16 L.Ed.2d 694. At the time, police were questioning Hoffner as a witness, not a suspect, and police did not arrest him or restrain him in any manner. See *State v. Richey* (1992), 64 Ohio St.3d 353, 361, 595 N.E.2d 915 (police not required to issue *Miranda* warnings, since Richey was initially interviewed only as a possible witness and was not under arrest or in custody).

{¶ 29} Moreover, there is no evidence that police officers coerced Hoffner into making any statements. After initially denying all knowledge of Hammer's disappearance, Hoffner asked to speak with Leiter and Hunt. Then he voluntarily offered information that Dixon had killed Hammer. Hoffner's statements were not made in response to police questioning, nor were they compelled by police in any manner. See *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694 (any statement given freely and voluntarily without compelling influences is admissible).

{¶ 30} Police did briefly restrict Hoffner's movement during the initial stages of the search in order to secure the location and search the area for weapons and evidence. Nevertheless, directing Hoffner to stay in a specific location (i.e., sit in a chair) was reasonable in light of the circumstances. After the weapons search was completed, police never told Hoffner that he could not leave the premises, nor did Hoffner ever state that he wanted to leave.

{¶ 31} Events after Hoffner left the Wilkerson residence with Leiter and Hunt further confirm that Hoffner was not in custody. Hoffner voluntarily agreed to go to police headquarters to give a taped statement. On the way to the station, Hoffner offered to direct police to the location of Hammer's body. Police did not threaten Hoffner or make any promises in exchange for this information. Again, police had not arrested Hoffner, nor was he handcuffed or restrained in any manner. In fact, while leading Lieutenant Hunt to Hammer's grave, Hoffner was, at one point, ahead of him by 30 to 40 yards, and, at times, out of his sight.

{¶ 32} After arriving at the station, detectives read Hoffner his *Miranda* rights but again did not place him under arrest. Hoffner stated that he understood his rights, agreed that he was not under the influence of drugs or alcohol, and signed a waiver-of-rights form. Hoffner agreed that he came to the station of his own free will and acknowledged that police had not threatened or promised him anything in return for his statement. After Hoffner gave a taped statement, police drove him back to Wilkerson's house, and he then packed his belongings and drove himself to Perrysburg.

{¶ 33} Finally, after he was arrested and taken into custody on November 10, detectives again issued *Miranda* warnings to Hoffner. He then executed a voluntary waiver of his rights before confessing to his part in Hammer's murder.

{¶ 34} Because Hoffner was not under arrest or in custody during the execution of the search warrant or when he directed detectives to Hammer's body, police were not required to issue *Miranda* warnings. Moreover, Hoffner was not in custody at the police station when he was interviewed on November 9 as a witness only. Finally, prior to his interview at the police station on November 9 and again after his arrest on November 10, he executed a valid, written waiver of his *Miranda* rights. All of Hoffner's statements regarding

Hammer's disappearance and murder were voluntarily made and properly admitted at trial.

{¶ 35} Accordingly, Hoffner's first proposition of law is overruled.

{¶ 36} In his second proposition of law, Hoffner contends that the trial court erred in denying his motion to suppress physical evidence seized from his automobile. Hoffner argues that his consent to search was not voluntary.

{¶ 37} During the search on November 9, Detective Larry Scoble noticed an automobile parked outside the Wilkerson residence. In response to Scoble's inquiry, Hoffner acknowledged that the car was his. Scoble requested permission to search the vehicle, and Hoffner verbally agreed. Hoffner, Scoble, and Detective Ron Scanlon then went outside to the car, where Hoffner read and signed a consent-to-search form. Police then searched Hoffner's car and confiscated a pair of tennis shoes, a notebook, and a pharmacy receipt.

{¶ 38} In order to waive one's Fourth Amendment privilege against unreasonable searches and seizures, one must voluntarily consent to the search. Whether consent was voluntarily given is determined by the totality of the circumstances. *State v. Childress* (1983), 4 Ohio St.3d 217, 4 OBR 534, 448 N.E.2d 155, paragraph one of the syllabus (*Schneckloth v. Bustamonte* [1973], 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854, followed).

{¶ 39} Hoffner argues on appeal that the items seized should have been suppressed because the presence of police officers invalidated his consent. However, none of the items seized from Hoffner's automobile was introduced into evidence at his trial. In any event, Hoffner freely consented to the search. Hoffner was not under arrest or restrained in any manner, and police made no threats or promises to obtain his cooperation. Nor does any evidence indicate that Hoffner was under the influence of drugs or alcohol or that he did not understand the consequences of signing the consent-to-search form. See, e.g., *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, at ¶ 63–70.

{¶ 40} Hoffner's second proposition of law is overruled.

## II

### Ineffective Assistance of Counsel

{¶ 41} In his third proposition of law, Hoffner makes various claims relating to ineffective assistance of counsel. Reversal of a conviction or sentence based upon ineffective assistance of counsel requires satisfying the two-pronged test set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. *Strickland* requires that the defendant show, first, that counsel's performance was deficient, and second, that counsel's deficient performance prejudiced the

defense so as to deprive the defendant of a fair trial. Id. at 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 42} Hoffner first contends that defense counsel were deficient for failing to file a post-hearing brief in support of the motion to suppress his statements to police. As discussed under the first proposition of law, the trial court properly denied suppression of Hoffner's pre-arrest and post-arrest statements. Hoffner has not shown how the filing of a post-hearing brief would have altered the trial court's decision.

{¶ 43} Hoffner next contends that defense counsel were deficient in presenting only a brief opening statement during the guilt phase. During opening statement, defense counsel informed the jury that it would have to analyze every count of the indictment, "element by element," and that the burden was on the prosecutor to prove Hoffner's guilt beyond a reasonable doubt as to each element of the offenses charged. While admittedly brief, defense counsel's opening statement represented a tactical choice, and Hoffner has failed to establish that his counsel's performance was deficient or prejudicial. See *State v. Ballew* (1996), 76 Ohio St.3d 244, 256–257, 667 N.E.2d 369.

{¶ 44} Hoffner also challenges defense counsel's cross-examination of the state's witnesses. Defense counsel cross-examined three witnesses and was able to elicit testimony that Dixon was the primary planner and actor of the crimes against Hammer and that Dixon's photo, and not Hoffner's, appeared on the fraudulent ID. Defense counsel attempted to discredit the testimony of the state's key witness, Kirsten Wilkerson, based upon her plea agreement with the state. Counsel also elicited testimony from Wilkerson that Dixon had been violent toward her but that she was not afraid of Hoffner.

{¶ 45} We conclude that counsel's strategy reflected reasonable representation. The scope of cross-examination clearly falls within the ambit of trial strategy, and debatable trial tactics do not establish ineffective assistance of counsel. *State v. Campbell* (2000), 90 Ohio St.3d 320, 339, 738 N.E.2d 1178; *State v. Otte* (1996), 74 Ohio St.3d 555, 565, 660 N.E.2d 711. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 142–144, 538 N.E.2d 373. The decision to forgo additional cross-examination was likely predicated on defense counsel's desire to avoid reinforcing the state's evidence, which consisted primarily of eyewitness accounts and Hoffner's confession. Hoffner has not shown that counsel's performance was deficient or that additional cross-examination would have altered the outcome of his trial.

{¶ 46} Hoffner also alleges that defense counsel were deficient during the guilt phase for repeatedly "describing the crime in the prosecution's terms—rather than the defense's." Hoffner cites only two isolated comments by defense counsel. During opening statement, defense counsel informed the jury that they

would not dispute the prosecution's portrayal of Hammer's death as "horrific" and "a terrible tragedy." Defense counsel made a similar reference to this horrible event during cross-examination of Wilkerson. Considering the nature of the offenses here, these comments from the defense do not amount to unreasonable trial tactics. See *State v. Campbell*, 90 Ohio St.3d at 337, 738 N.E.2d 1178.

{¶ 47} Hoffner also complains that defense counsel were deficient by not presenting a guilt-phase closing argument. Defense counsel made a tactical decision to waive closing argument in order to preclude any rebuttal argument from the prosecutor. Courts must be highly deferential to counsel's performance and will not second-guess trial strategy decisions. See *State v. Tibbetts* (2001), 92 Ohio St.3d 146, 166, 749 N.E.2d 226. Hoffner has not shown that counsel's strategy was unreasonable or prejudicial. See, e.g., id. at 166–167, 749 N.E.2d 226. See, also, *State v. Keith* (1997), 79 Ohio St.3d 514, 537, 684 N.E.2d 47 (failure to make an opening and closing argument will not result in ineffectiveness per se).

{¶ 48} In his final claim under this proposition, Hoffner asserts that defense counsel were deficient during closing argument in the mitigation phase of the trial. Specifically, Hoffner claims that counsel were deficient in making the following comments:

{¶ 49} "This is a heinous crime, it's unbelievable. * * *

{¶ 50} "Please don't mistake any of my remarks as an attempt to evoke sympathy on behalf of Timothy L. Hoffner, because I don't feel any, not a bit. I feel revulsion and confusion in equal parts because of everything that we have heard * * *.

{¶ 51} "* * *

{¶ 52} "To stand before you and ask for 20 full years to the parole board is an abomination and it's an insult to you, to me and to the Hammers."

{¶ 53} In this case, we determine that defense counsel's comments do not reflect deficient performance and that they were not prejudicial. Rather than an abandonment of Hoffner's mitigation defense, counsel's comments were an apparent attempt to acknowledge the particularly gruesome nature of the crime and to preserve credibility between counsel and the jury. See, e.g., *State v. Hartman* (2001), 93 Ohio St.3d 274, 295–296, 754 N.E.2d 1150; *State v. Campbell*, 90 Ohio St.3d at 337, 738 N.E.2d 1178. Judicial scrutiny of counsel's performance must be highly deferential, and reviewing courts should refrain from second-guessing the strategic decisions of trial counsel. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674.

{¶ 54} Furthermore, Hoffner misconstrues defense counsel's final comment. In making this statement, counsel merely informed the jury that their mitigation

strategy was to seek a life sentence for Hoffner with the possibility of parole after 30 years, instead of parole after 20 years. Counsel apparently believed that any attempt to seek the lesser sentence of life with the possibility of parole after 20 years would have alienated the jury. This tactic was not unreasonable in light of the particularly heinous nature of the aggravated murder committed here.

{¶ 55} Based on the foregoing, we overrule Hoffner's third proposition of law.

{¶ 56} Hoffner contends in his ninth proposition of law that defense counsel's failure to preserve errors at trial deprived Hoffner of the effective assistance of counsel. "The failure to object to error, alone, is not enough to sustain a claim of ineffective assistance of counsel." *State v. Holloway* (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831. Upon review of the record, we hold that Hoffner has failed to satisfy the test outlined in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. Hoffner has pointed to only three instances where defense counsel failed to object to alleged errors committed by the trial court. See the fourth, fifth, and sixth propositions of law. These complaints have been examined and are without merit. Hoffner has failed to identify any other instance where he was prejudiced by counsel's failure to preserve an issue for appeal.

{¶ 57} Hence, Hoffner's ninth proposition of law is overruled.

## III

## Guilt–Phase Issues

{¶ 58} In his fourth proposition of law, Hoffner contends that the trial court's failure to inquire on the record whether he knowingly and intelligently waived his right to testify violated his right to due process. We rejected this same argument in *State v. Bey* (1999), 85 Ohio St.3d 487, 499–500, 709 N.E.2d 484.

{¶ 59} Thus, the fourth proposition of law is overruled.

{¶ 60} Hoffner contends in the sixth proposition of law that the trial court erred by instructing the jury using the statutory definition of "reasonable doubt" contained in R.C. 2901.05(D). However, defense counsel failed to object to this instruction and thereby waived all but plain error. Crim.R. 52(B).

{¶ 61} We conclude that no error, plain or otherwise, occurred. The definition of "reasonable doubt" set forth in R.C. 2901.05(D) correctly conveys the concept of reasonable doubt and is not an unconstitutional dilution of the state's burden to prove guilt beyond a reasonable doubt. See *State v. Van Gundy* (1992), 64 Ohio St.3d 230, 232, 594 N.E.2d 604; and *State v. Getsy* (1998), 84 Ohio St.3d 180, 202, 702 N.E.2d 866. The trial court's reasonable-doubt instruction in the guilt phase was in accord with R.C. 2901.05(D).

{¶ 62} The definition of reasonable doubt in the penalty phase was also not error. That instruction comports with the instruction we suggested in *State v. Goff* (1998), 82 Ohio St.3d 123, 132, 694 N.E.2d 916.

{¶ 63} Therefore, we overrule the sixth proposition of law.

## IV

### Penalty–Phase Issues

{¶ 64} Hoffner claims in his fifth proposition of law that the trial court erred in instructing the jury that the issue of punishment would ultimately be left to the court. At the close of the guilt phase, the trial court instructed the jury:

{¶ 65} "In reaching your verdict, you may not discuss or consider the subject of punishment. Your duty is confined to the determination of the guilt or innocence of the Defendant. In the event you find the Defendant guilty, the duty to determine the proper punishment is placed by law, ultimately, on the Court."

{¶ 66} This instruction is appropriate at the guilt stage to ensure that the question of punishment is not discussed during the jury's deliberations on the defendant's guilt or innocence. Notwithstanding, Hoffner challenges the effect of the instruction on the jury's penalty recommendation. Although it was not challenged on appeal, the trial court gave a similar instruction during the penalty phase when it referred to the jury's penalty determination as a recommendation.

{¶ 67} Defense counsel failed to object in both instances and has waived all but plain error. Crim.R. 52(B). We have previously determined that an instruction informing the jury that a recommendation of death is not binding on the trial court is an accurate statement of law and does not constitute reversible error. See *State v. Carter* (1995), 72 Ohio St.3d 545, 559, 651 N.E.2d 965; *State v. Woodard* (1993), 68 Ohio St.3d 70, 77, 623 N.E.2d 75; and R.C. 2929.03(D)(3). Likewise, the trial court's instructions here do not constitute plain error. See *State v. Phillips* (1995), 74 Ohio St.3d 72, 100–101, 656 N.E.2d 643.

{¶ 68} We also reject Hoffner's contention, raised by appellate counsel during oral argument, that the trial court's instructions here amount to reversible error based on *Ring v. Arizona* (2002), 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556. In *Ring*, the United States Supreme Court held that Arizona's capital-sentencing scheme violated the defendant's Sixth Amendment jury-trial guarantee because it entrusted the trial judge, and not the jury, with making factual determinations as to the existence of aggravating circumstances necessary for imposition of the death penalty. Id. at 609, 122 S.Ct. 2428, 153 L.Ed.2d 556.

{¶ 69} We hold, however, that *Ring* has no possible relevance to Hoffner's case, or to Ohio's death penalty statute. Under the Arizona sentencing statutes proscribed in *Ring*, the trial court was solely responsible for making all factual

determinations regarding whether a defendant should be sentenced to death. Id. at 592–593, 122 S.Ct. 2428, 153 L.Ed.2d 556 (construing Ariz.Rev.Stat. Sections 13–703 and 13–1105[C] ). In contrast, Ohio's capital-sentencing scheme places that responsibility with the jury. R.C. 2929.03 charges the jury with determining, by proof beyond a reasonable doubt, the existence of any statutory aggravating circumstances and whether those aggravating circumstances are sufficient to outweigh the defendant's mitigating evidence. R.C. 2929.03(B) and (D).

{¶ 70} Here, the jury made the required factual findings regarding the existence of statutory aggravating circumstances and further found that the aggravating circumstances outweighed the factors in mitigation beyond a reasonable doubt. Clearly, the Sixth Amendment violation found in *Ring* is not implicated in this matter. Thus, the trial court's instructions did not violate *Ring*, and any contention by Hoffner that the jury's responsibility in imposing the death sentence was diminished is without merit.

{¶ 71} Accordingly, Hoffner's fifth proposition of law is overruled.

{¶ 72} In his seventh proposition of law, Hoffner requests that the court reconsider its decision in *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus, and give weight to residual doubt as a mitigating factor when it conducts its independent review of Hoffner's death sentence. However, we rejected exactly this argument in *State v. Green* (2000), 90 Ohio St.3d 352, 360, 738 N.E.2d 1208.

{¶ 73} Therefore, we overrule Hoffner's seventh proposition of law.

{¶ 74} In the eighth proposition of law, Hoffner contends that his death sentence should be reversed and his case remanded for resentencing because of flaws in the trial court's R.C. 2929.03(F) sentencing opinion. We disagree.

{¶ 75} Hoffner first asserts that the trial court erred by weighing the aggravating circumstances against individual mitigating factors instead of the collective mitigation evidence. Specifically, Hoffner contends that the trial court weighed the aggravating circumstances against the individual mitigating factors of Hoffner's history, character, and background. See R.C. 2929.04(B). This claim lacks merit.

{¶ 76} The trial court found that Hoffner had established the following mitigating factors during the mitigation hearing: Hoffner's relative youth (21 years old) at the time of the murder, R.C. 2929.04(B)(4); his lack of any significant criminal history, R.C. 2929.04(B)(5); and his antisocial and schizotypal personality disorders, R.C. 2929.04(B)(7). The trial court gave limited weight to Hoffner's youth, found that his "almost unblemished criminal record" was a significant mitigating factor, and noted that his personality disorders provided a "moderate basis" for mitigation. The trial court also considered Hoffner's

abusive and bizarre upbringing to be mitigating but found nothing mitigating in the nature and circumstances of the offense. The trial court then concluded that "the aggravated circumstances so clearly demonstrated by the evidence at trial, far, far outweighed the modest *cumulative* mitigating factors presented in this case during the penalty phase." (Emphasis added.) Thus, it is clear that the trial court individually evaluated the mitigating factors but when weighing the mitigation evidence against the aggravating circumstances, it considered the mitigating factors, as a whole.

{¶ 77} Hoffner also contends that the trial court considered the nature and circumstances of the offense as an aggravating circumstance. In its sentencing opinion, the trial court stated, "Sympathy for the defendant's mistreatment as a child, however, can in no way excuse the depraved, violent and calculated nature of the acts he committed against Christopher Hammer." The dissenting opinion in the court of appeals concluded, based on the above-quoted language, that the trial court weighed the nature and circumstances of the offense as nonstatutory aggravating circumstances. The dissent also contended that the trial court "improperly trebled the weight accorded [the] sole aggravating circumstance" because it "separate[d] out kidnaping, robbery and prior calculation and design," all delineated in one statutory provision, R.C. 2929.04(A)(7). For the following reasons, we find that no prejudicial error occurred.

{¶ 78} First, the trial court did not refer to the nature and circumstances of the offense as "aggravating circumstances." Prior to sentencing, the trial court merged the three counts of aggravated murder into one count and sentenced Hoffner only in relation to Count I, the purposeful killing of Hammer with prior calculation and design. See R.C. 2903.01(A). In its sentencing opinion, the trial court set forth the two R.C. 2929.04(A)(7) capital specifications charged in Count I, and then summarized the evidence establishing Hoffner's guilt of the offenses and specifications charged. The trial court also evaluated Hoffner's mitigation evidence and, as noted above, concluded that the aggravating circumstances outweighed the modest cumulative mitigating factors. The trial court's opinion reflects the trial court's understanding of the difference between statutory aggravating circumstances and facts describing the nature and circumstances of the offense. See, e.g., *State v. Clemons* (1998), 82 Ohio St.3d 438, 447, 696 N.E.2d 1009.

{¶ 79} Second, a trial court "may rely upon and cite the nature and circumstances of the offense as reasons supporting its finding that the aggravating circumstances were sufficient to outweigh the mitigating factors." *State v. Stumpf* (1987), 32 Ohio St.3d 95, 512 N.E.2d 598, paragraph one of the syllabus. See *State v. Bradley,* 42 Ohio St.3d at 148, 538 N.E.2d 373; *State v. Wogenstahl* (1996), 75 Ohio St.3d 344, 361, 662 N.E.2d 311. In *State v. Steffen* (1987), 31 Ohio

St.3d 111, 117, 31 OBR 273, 509 N.E.2d 383, we noted that "the nature ·and circumstances of certain offenses will be such that no mitigating feature can be extracted." The trial court's comments here can be understood as justifying its conclusion that no mitigating value existed in the nature and circumstances of this particular offense.

{¶ 80} Third, the trial court did not "treble" the weight of the "sole" aggravating circumstance. Two aggravating circumstances were proven, not one, and, therefore, we find no reversible error in the trial court's separate reference to kidnapping, robbery, and prior calculation and design. In relation to its guilty verdict on Count I, the jury found that Hoffner had committed the aggravated murder with prior calculation and design. The trial court's comments about prior calculation and design merely reflected the jury's verdict. Moreover, the evidence proved that Hoffner was a principal offender in the aggravated murder, and the trial court specifically found that Hoffner was a principal offender. The trial court's opinion does not demonstrate that the trial court weighed prior calculation and design as a separate and distinct aggravating circumstance. Cf. *State v. Penix* (1987), 32 Ohio St.3d 369, 370–372, 513 N.E.2d 744; and *State v. Green*, 90 Ohio St.3d at 361, 738 N.E.2d 1208.

{¶ 81} Hoffner further claims that the trial court completely ignored mitigating evidence that he has below average intelligence and cognitive reasoning. See R.C. 2929.04(B)(7). We find nothing in the record to support Hoffner's assertion. In fact, mitigation testimony included descriptions of Hoffner as "very intelligent," indicated that Hoffner's IQ test scores fell well within the average range of intelligence, and reported that Hoffner did not suffer from any neurological defects. The trial court also gave modest weight to Hoffner's personality disorders, which the mitigation testimony indicated could have affected his cognitive abilities.

{¶ 82} Finally, Hoffner suggests that the trial court gave "no mitigating value" to his "consistent physical abuse as a child and 'bizarre' family members and life experiences." However, the trial court did consider Hoffner's history, character, and background, and accorded some weight to his history and background in mitigation. Even if the trial court had assigned no value in mitigation, the weight assigned to a given factor is a matter for the discretion of the individual decisionmaker. See *State v. Fox* (1994), 69 Ohio St.3d 183, 193–194, 631 N.E.2d 124.

{¶ 83} Accordingly, Hoffner's eighth proposition of law is overruled in its entirety.

{¶ 84} Hoffner contends in his twelfth proposition of law that the trial court erred in concluding that the aggravating circumstances in this case outweighed the mitigating factors. R.C. 2929.05(A) requires this court to independently

weigh the aggravating circumstances and the mitigating factors. Therefore, we will address this argument during our independent review of Hoffner's death sentence. During our independent review, we will also address Hoffner's claim in his thirteenth proposition of law that his death sentence is neither appropriate nor proportionate to the death sentences in other cases.

## V

### Constitutional Issues

{¶ 85} Hoffner in his tenth proposition of law raises numerous challenges to the constitutionality of Ohio's death penalty law. However, Ohio's capital-sentencing scheme is constitutional. See *State v. Evans* (1992), 63 Ohio St.3d 231, 253–254, 586 N.E.2d 1042; *State v. Smith* (1991), 61 Ohio St.3d 284, 294, 574 N.E.2d 510; *State v. Lott* (1990), 51 Ohio St.3d 160, 170, 555 N.E.2d 293; *State v. Taylor* (1997), 78 Ohio St.3d 15, 32, 676 N.E.2d 82; and *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264.

{¶ 86} Thus, Hoffner's tenth proposition of law is overruled.

{¶ 87} Hoffner contends in his eleventh proposition of law that the proportionality review required by R.C. 2929.05(A) is constitutionally defective. We find this claim meritless. *State v. Steffen*, 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus; *State v. Murphy* (1992), 65 Ohio St.3d 554, 583, 605 N.E.2d 884; *State v. Davis* (1991), 62 Ohio St.3d 326, 351, 581 N.E.2d 1362.

{¶ 88} Therefore, we overrule the eleventh proposition of law.

## VI

### Independent Sentence Review

{¶ 89} At the penalty hearing, Hoffner called nine mitigation witnesses, made an unsworn statement, and introduced documentary evidence.

{¶ 90} Several family members testified on Hoffner's behalf. Timothy Hoffner was born Timothy Cade out of wedlock in June 1972. Karen Kay Mueller Dillinger, Hoffner's biological mother, testified that she abandoned Hoffner shortly after his birth and that some steprelatives, Sally and Paul Hoffner, adopted him in 1973. Karen claimed that she did not realize she was placing Hoffner for adoption and that Sally and Paul were supposed to care for Hoffner only until she was financially and physically stable. After the adoption, Karen did not see or speak to Hoffner until 1984, when Karen and Hoffner had an overnight meeting. In 1992, Hoffner lived with Karen for about a month. Karen's husband, Doug Dillinger, accused her of sleeping with Hoffner, and after leaving Dillinger briefly, Karen returned to him without Hoffner. Karen denied

ever having sexual relations with Hoffner. By the time of the trial in 1995, Karen had not seen Hoffner in almost three years.

{¶ 91} Sally Hoffner Snyder, Hoffner's adoptive mother, testified that she and her husband, Paul, adopted Hoffner and his halfbrother, Danny, because Karen could not take care of them. Hoffner was sick and physically underdeveloped when adopted, suffered disabling headaches as a child, and exhibited mood swings. Hoffner also rocked constantly, to the point that he broke the springs of three rocking horses and wore out a rocking chair.

{¶ 92} Sally claimed that Hoffner behaved badly growing up, fought constantly with Danny, was always in trouble at school, and once killed a cat. Because of his poor behavior, Sally and Paul would often discipline Hoffner by striking him with a belt or paddle. Sally insisted that this occurred only when Hoffner misbehaved and that he was never physically abused.

{¶ 93} According to Sally, Hoffner's behavior worsened after her husband was diagnosed with cancer, and she claimed that Hoffner attempted suicide after Paul's death in 1987. Sally had sought psychological counseling for Hoffner as a result of his disruptive behavior. The Hoffner family also received counseling to deal with their grief from Paul's death. According to Sally, efforts to treat Hoffner were unsuccessful.

{¶ 94} Patricia Hoffner, Sally and Paul's biological daughter and Hoffner's adoptive sister, testified that she was very close to Hoffner. According to Patricia, Hoffner was very bright and articulate. Patricia admitted that her parents disciplined her with a belt, but she did not consider this physical abuse. Patricia also never saw Hoffner beaten with a belt. Patricia described an incident where her father had fondled her but stated that Hoffner never knew of this sexual incident and would not have been affected by it. Patricia agreed that Hoffner and Danny fought a lot while growing up, but she considered this normal horseplay. Patricia moved out of the Hoffner home in 1980 when Hoffner was eight years old.

{¶ 95} Danny Hoffner, Hoffner's halfbrother, testified that when he was three or four years old, he saw Hoffner stuff a kitten into a Tonka toy. Danny admitted, however, that he did not actually witness Hoffner kill the kitten. Danny and Hoffner had a strained relationship, and they fought constantly, both verbally and physically, while growing up. Danny also did not get along with his adoptive father but did love him, and both he and Hoffner were angry when their adoptive father passed away.

{¶ 96} Danny claimed that his adoptive parents beat him and Hoffner hundreds of times. While Danny agreed that punishment was sometimes warranted, he believed that the punishments were too severe. Danny said that he had

previously undergone psychological counseling and was recently prescribed Prozac for clinical depression.

{¶ 97} Danny also testified that he knew in advance that his brother and Dixon were planning to harm Hammer. Danny had warned Hammer and had tried to dissuade Hoffner from hurting Hammer. Danny also said that Dixon had threatened him and that he had been scared for his life.

{¶ 98} Sherrie Specht, Sally's estranged halfsister and Hoffner's adoptive aunt, testified that Sally favored Danny over Hoffner and believes that Sally hates Hoffner. Sherrie noted that Hoffner was upset about his adoptive father's death and that Danny and Hoffner fought in front of the casket at Paul's funeral. After Paul died, Sherrie observed Sally and Danny together in the same bed, although Danny and Sally denied ever having sexual relations.

{¶ 99} Additional testimony of Sally, Danny, and Patricia Hoffner provided further evidence regarding Hoffner's history and background. Hoffner grew up in a family that exhibited survivalist tendencies. The Hoffners possessed several firearms for protection, and guns were always kept loaded and unsecured in various rooms throughout the house. The house was equipped with a security system and motion detectors, and Sally testified that the neighbors were warned not to come over at night without first calling because they might get shot. The family also had two refrigerators and two commercial freezers containing a year's supply of food.

{¶ 100} The Hoffner children were generally not allowed to participate in activities outside the home because their parents feared for their safety. However, after Patricia moved out of the house, she would return home to take Hoffner and Danny to the movies and shopping, and Hoffner stayed at her house many times.

{¶ 101} Kirsten Wilkerson stated that Hoffner did not cause any problems while he lived at her house.

{¶ 102} Two licensed clinical psychologists, Dr. Jeffrey Smalldon and Dr. Janice Ort, also testified for Hoffner.

{¶ 103} Dr. Smalldon performed a complete neuropsychological evaluation of Hoffner to see whether Hoffner suffered from any psychotic disorders. Dr. Smalldon performed a battery of psychological tests and considered Hoffner's early history of neglect and deprivation, three incidents where Hoffner suffered head injuries, his tendency to engage in frequent, rhythmic rocking, his claim of alcohol abuse as a teenager, and allegations of physical abuse at the hands of his adoptive parents.

{¶ 104} Dr. Smalldon concluded that Hoffner did not suffer from any structural or organic brain impairment or any formal psychotic disorder. Dr. Smalldon

described Hoffner as "very bright" and "very intelligent," and he was impressed with Hoffner's mental agility. However, Hoffner's odd, idiosyncratic behavior and his lack of appropriate emotional expression suggested a serious personality disorder. Dr. Smalldon did not perform a clinical evaluation of Hoffner and could not make a formal diagnosis of a personality disorder. Dr. Smalldon noted that Hoffner understands the difference between right and wrong.

{¶ 105} Dr. Janice Ort assessed Hoffner's psychological and intellectual functioning. Dr. Ort diagnosed Hoffner as suffering from antisocial schizotypal personality disorders. She also found that Hoffner suffered from major depression, dysthymia (a lengthy form of depression attributable to his adoptive father's death), and alcohol and cannabis abuse. Dr. Ort also noted that the Navy discharged Hoffner because he suffered from a nonspecific personality disorder. Dr. Ort believed that Hoffner's abusive, neglected upbringing and dysfunctional family contribute to his personality disorders and that these disorders impaired his behavior and judgment.

{¶ 106} On cross-examination, Dr. Ort admitted that Hoffner's incarceration could have exacerbated his depression. Dr. Ort also agreed that Hoffner knows the difference between right and wrong and that he is capable of conforming his behavior to the requirements of the law.

{¶ 107} Additionally, Sally Ann Walters, Chief of the Bureau of Sentence Computation for the Department of Rehabilitation and Correction, testified as to the length of time that Hoffner would remain incarcerated if the jury recommended a life sentence. Walters concluded that under a life sentence with parole eligibility after 30 years and with maximum, consecutive sentences for his other convictions, Hoffner would serve a minimum of 46.3 years before parole eligibility.

{¶ 108} In his unsworn statement, Hoffner told the jury, "I'm sorry for what I've done and I know that's not enough. I liked Chris. I wish I could take it back. I know I need to be punished for what I've done. Thank you." Hoffner also submitted for the jury's consideration defense counsel's letter to the prosecutor offering to plead guilty to all charges if the death penalty specifications were dismissed.

{¶ 109} In his twelfth proposition of law, Hoffner contends that the trial court erred in concluding that the aggravating circumstances outweighed the mitigating factors. In the thirteenth proposition of law, Hoffner challenges the proportionality of his death sentence. Based on our independent review, we overrule Hoffner's propositions of law.

{¶ 110} After independent assessment, we find that the evidence established beyond a reasonable doubt the two R.C. 2929.04(A)(7) aggravating circumstances charged against Hoffner. Hoffner murdered Hammer during the commission of

an aggravated robbery and during a kidnapping and was a principal offender in the aggravated murder.

{¶ 111} Upon a review of the evidence in mitigation, we find nothing in the nature and circumstances of the offenses to be mitigating. Hoffner, along with codefendant Dixon, brutally beat Hammer, tied him to a bunk-bed ladder, and robbed him of his automobile and personal papers. When Hoffner's attempts to break Hammer's neck failed, Hoffner and Dixon drove him to a remote area and buried him alive. Dixon then assumed Hammer's identity, sold his car, and shared the proceeds with Hoffner.

{¶ 112} In contrast, we find that Hoffner's history and background provide some mitigating features. Hoffner had a troubled and dysfunctional upbringing. Hoffner was neglected and abandoned by his birth mother. Throughout childhood, Hoffner was angry and spiteful toward his adoptive mother. Hoffner began performing poorly in school after his adoptive father was diagnosed with cancer, and Hoffner was adversely affected by his death. Hoffner did not graduate from high school but did obtain his GED while incarcerated for Hammer's murder. While growing up, Hoffner was routinely disciplined by corporal punishment.

{¶ 113} In addition, Hoffner's bizarre home life warrants consideration. Hoffner grew up in a home heavily protected with loaded firearms and other security measures. Loaded guns were readily accessible to the Hoffner children. The Hoffner children also were prohibited from engaging in normal social activities outside the home. This survivalist and isolationist mentality was enhanced by the family's practice of stocking an overabundance of food in refrigerators and commercial freezers.

{¶ 114} We have found in other cases where defendants had backgrounds similar to or worse than Hoffner's that such mitigation was insufficient to outweigh the aggravating circumstances. Cf. *State v. Campbell* (2002), 95 Ohio St.3d 48, 50–54, 765 N.E.2d 334; *State v. Biros* (1997), 78 Ohio St.3d 426, 455–457, 678 N.E.2d 891; *State v. Cooey* (1989), 46 Ohio St.3d 20, 41–42, 544 N.E.2d 895. In this case, we find that Hoffner's history and background are entitled to only slight mitigating weight. See, e.g., *State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, at ¶ 147–167; *State v. Jones* (2001), 91 Ohio St.3d 335, 357, 744 N.E.2d 1163. In contrast to his history and background, we find nothing in Hoffner's character to be mitigating.

{¶ 115} Hoffner established the following statutory mitigating factors. At the time of the offense, Hoffner was 21 years old. Therefore, his youth is entitled to weight under R.C. 2929.04(B)(4). See id.; *State v. Jones*, 91 Ohio St.3d at 357, 744 N.E.2d 1163; and *State v. Brown*, 100 Ohio St.3d 51, 2003-Ohio-5059, 796 N.E.2d 506, at ¶ 59. Hoffner had one juvenile conviction for petty theft and,

thus, we conclude that his lack of a significant history of criminal convictions and juvenile adjudications is entitled to significant weight in mitigation. R.C. 2929.04(B)(5). See *State v. White* (1999), 85 Ohio St.3d 433, 454, 709 N.E.2d 140.

{¶ 116} We find no other statutory mitigating factors applicable: R.C. 2929.04(B)(1) (inducement by victim); (B)(2) (duress, coercion, or strong provocation); (B)(3) (mental disease or defect); and (B)(6) (accomplice only).

{¶ 117} As to the R.C. 2929.04(B)(7) "other factors," we accord no weight to the testimony regarding the length of sentence Hoffner would serve before parole eligibility. See, e.g., *State v. White*, 85 Ohio St.3d at 448–449, 709 N.E.2d 140. We accord only minimal weight to Hoffner's offer to plead guilty to the charges in exchange for the prosecutor's dismissing the death penalty specifications from the indictment, as Hoffner knew that the evidence against him was overwhelming.

{¶ 118} Hoffner's personality disorders, his depression, his abuse of alcohol and marijuana, and his confession collectively deserve some weight in mitigation. See, e.g., *State v. Wilson* (1996), 74 Ohio St.3d 381, 400–401, 659 N.E.2d 292. Cf. *State v. Biros*, 78 Ohio St.3d at 457, 678 N.E.2d 891 (defendant's personality disorder, lifelong alcohol dependence, and depression collectively entitled to some, but very little, weight in mitigation).

{¶ 119} Hoffner, however, confessed only after he was implicated and taken into custody, and he had previously misled police as to his involvement. See, e.g., *Wilson*, 74 Ohio St.3d at 401, 659 N.E.2d 292. In addition, personality disorders that, like Hoffner's, result from a troubled and dysfunctional upbringing, are often accorded little weight when they do not cause mental illness so severe as to inhibit a defendant's ability to control his actions. Id. As to Hoffner's severe depression, it is, at best, a weak mitigating factor. See, e.g., *State v. White*, 85 Ohio St.3d at 456, 709 N.E.2d 140. Testimony suggested that his incarceration could have exacerbated his depression, and it is unclear what role, if any, his depression played in these crimes. Similarly, it has not been shown that Hoffner's substance abuse affected his judgment or played a part in the murder. Cf., *State v. Hartman*, 93 Ohio St.3d at 306, 754 N.E.2d 1150. Finally, we accord little weight to Hoffner's expression of remorse in his unsworn statement. See, e.g., *State v. Keene* (1998), 81 Ohio St.3d 646, 671, 693 N.E.2d 246 ("retrospective remorse" entitled to little weight in mitigation); *State v. Stumpf*, 32 Ohio St.3d at 106, 512 N.E.2d 598.

{¶ 120} In summary, Hoffner's collective mitigation evidence is relatively modest when compared with the aggravating circumstances. Based on the evidence, we conclude that the aggravating circumstances of this murder during a kidnapping and robbery outweigh Hoffner's combined mitigating factors beyond a reasonable doubt. Therefore, we find that the death penalty is appropriate in this case.

{¶ 121} Finally, we find that the death penalty imposed here is proportionate to death sentences approved in similar cases. See, e.g., *State v. Coley* (2001), 93 Ohio St.3d 253, 273, 754 N.E.2d 1129; *State v. Moore* (1998), 81 Ohio St.3d 22, 44, 689 N.E.2d 1; *State v. Henness* (1997), 79 Ohio St.3d 53, 69, 679 N.E.2d 686; *State v. Cook* (1992), 65 Ohio St.3d 516, 531, 605 N.E.2d 70; and *State v. Roe* (1989), 41 Ohio St.3d 18, 28–29, 535 N.E.2d 1351.

{¶ 122} For the foregoing reasons, we affirm the convictions and sentences, including the sentence of death.

Judgment affirmed.

MOYER, C.J., BLACKMON, F.E. SWEENEY, PFEIFER, O'CONNOR and O'DONNELL, JJ., concur.

PATRICIA A. BLACKMON, J., of the Eighth Appellate District, sitting for RESNICK, J.

## APPENDIX

{¶ 123} First Proposition of Law: A trial court commits error when oral statements to police officers are taken in violation of his [sic] due process rights guaranteed under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

{¶ 124} Second Proposition of Law: A trial court commits error by denying a motion to suppress where the search was the result of a waiver of counsel and the waiver of a search warrant taken in violation of his Fourth, Fifth, Sixth, and Fourteenth Amendments to the United States Constitution and the applicable portions of the Ohio Constitution.

{¶ 125} Third Proposition of Law: A criminal defendant is denied due process and the right to effective assistance of counsel where the actions of his trial counsel fall below any accepted standard of competence in violation of his Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the Ohio Constitution.

{¶ 126} Fourth Proposition of Law: A trial court errs and a criminal defendant is denied due process of law under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution where it fails to determine if a criminal defendant's failure to testify is the result of his own decision.

{¶ 127} Fifth Proposition of Law: A criminal defendant is denied due process of law guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution when a jury in a death penalty case is instructed by the trial court that the ultimate question of punishment is for the trial court, and not the jury.

{¶ 128} Sixth Proposition of Law: A trial court commits error in violation of a criminal defendant's right to due process under the Fourteenth Amendment to the United States Constitution when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

{¶ 129} Seventh Proposition of Law: A criminal appellant in a death penalty case is denied due process of law guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution where its [sic] ability to conduct an independent analysis of the appropriateness of the death sentence is restricted by this court's decision in *State v. McGuire*.

{¶ 130} Eighth Proposition of Law: A jury and trial court violate [their] duty and also the Constitutions of the United States and of the State of Ohio by imposing a sentence of death by misweighing aggravating circumstances against mitigating factors and by weighing the nature and circumstances of the offense against the mitigating factors.

{¶ 131} Ninth Proposition of Law: Insofar as any of the errors complained of herein are deemed not to have been preserved properly by trial counsel, counsel provided appellant [sic] was denied the effective assistance of counsel to which he is constitutionally entitled.

{¶ 132} Tenth Proposition of Law: A criminal defendant's due process rights under the United States and Ohio Constitutions are violated when a trial court denies his motion to dismiss the death specifications and permits the matter to go to trial with the death penalty as a sentencing option.

{¶ 133} Eleventh Proposition of Law: The requirement imposed by the Supreme Court of Ohio that mandated proportionality review of death sentences include in the sample to be reviewed only those cases where the punishment of death was imposed is defective and wrong in theory and in practice and denies a capitally sentenced person his rights under the Fifth, Sixth, Eighth, Ninth and Fourteenth Amendments to the United States Constitution and under Sections 1, 2, 5, 9, 10, 16, and 20, Article I of the Ohio Constitution.

{¶ 134} Twelfth Proposition of Law: A trial court errs where it concludes that the aggravating circumstances, specifically that the aggravated murder was committed in the course of an aggravated robbery and that the defendant was the principal offender in the aggravated murder, outweighed the mitigating factors beyond a reasonable doubt.

{¶ 135} Thirteenth Proposition of Law: A death sentence under the facts of this case is neither appropriate nor in proportion to the death sentence in other cases.

Julia R. Bates, Lucas County Prosecuting Attorney, and Craig T. Pearson, Assistant Prosecuting Attorney, for appellee.

Spiros P. Cocoves and Ann M. Baronas, for appellant.