OPINION
{¶ 1} Jason A. Farris was found guilty by a jury in the Clark County Court of Common Pleas of one count of felonious assault, in violation of R.C. 2903.11(A)(2). He was sentenced to two years of incarceration and ordered to pay restitution and costs.
Farris appeals from his conviction, raising six assignments of error.
"The court erred by allowing this case to go to the jury and not dismissing the case and acquitting the defendant when the state failed to establish the elements of a crime as being committed by defendant. This has resulted in a denial of due process to the rights of defendant."
 {¶ 2} "The verdict of the jury was against the manifest weight of the evidence."
 {¶ 3} In his first assignment of error, Farris claims that the state failed to establish each of the elements of felonious assault. Thus, he asserts that the trial court should have entered a judgment of acquittal. In his fourth assignment of error, Farris claims that his conviction is against the manifest weight of the evidence. In essence, Farris contends that the state's witnesses were incredible. He notes that there were discrepancies between the statements given by the state's witnesses at Mercy Hospital and their trial testimony, and that the testimonies of the state's witnesses were internally inconsistent. Farris thus contends that he presented the greater amount of credible evidence in support of his innocence. To facilitate our analysis, we will address these assignments of error together.
 {¶ 4} Criminal Rule 29(A) provides that the trial court shall enter a judgment of acquittal on one or more offenses charged in the indictment if the evidence is insufficient to sustain a conviction of such offense or offenses. "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380, 386,1997-Ohio-52, 678 N.E.2d 541, citing Black's Law Dictionary (6th Ed. 1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis, 79 Ohio St.3d 421, 430,1997-Ohio-372, 683 N.E.2d 1096, citing Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d. 560. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id. We note that, although Farris did not make a Crim.R. 29 motion at trial, his "not guilty" plea preserved his right to challenge the sufficiency of the state's evidence on appeal. State v. Jones, 91 Ohio St.3d 335, 346, 2001-Ohio-57,744 N.E.2d 1163; State v. Faith, Columbiana App. No. 03-CO-48, 2004-Ohio-3048, ¶ 8-10.
 {¶ 5} In contrast, when a conviction is challenged on appeal as being against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Thompkins, 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact sees and hears the witnesses and is particularly competent to decide "whether, and to what extent, to credit the testimony of particular witnesses," we must afford substantial deference to its determinations of credibility. State v. Lawson (Aug. 22, 1997), Montgomery App. No. 16288. "Contrastingly, the decision as to which of several competing inferences, suggested by the evidence in the record, should be preferred, is a matter in which an appellate judge is at least equally qualified, by reason and experience, to venture an opinion." Id. A judgment should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. Martin,20 Ohio App.3d at 175.
 {¶ 6} According to the state's evidence, Farris first met Phil Hubbard in the Fall of 2002. Hubbard testified that he had installed a CD player in Farris's truck and that Farris had later accused Hubbard of stealing it. Animosity between Farris and Hubbard grew after Farris began dating Hubbard's ex-girlfriend, Nicole Barnett. During the Fall of 2002, Farris and his friends came to Hubbard's grandmother's home, where Hubbard lived, to fight him; Hubbard was not home. Upon hearing of their visit, Hubbard called Farris and told Farris that he would fight him.
 {¶ 7} On April 14, 2003, Hubbard, Andrew Barth, and Kody Sickles decided to go to a train trestle over the Mad River between Lower Valley Pike and the Snyderville area of Springfield, Ohio, to fish. It was a relatively warm day, with the high temperature predicted to be 74 degrees. On the way to the trestle, Barth, Hubbard and Sickles first visited the home of Barth's ex-girlfriend, Jennifer Barnett (Nicole's older sister), so that Barth could talk with her. At the Barnett home, Hubbard and Sickles had remained in the van while Barth spoke with Jennifer. Also at the home were numerous teenaged boys who resided in the Snyderville area: Farris, Brent Spencer, Lloyd Barnett (Jennifer and Nicole's cousin), Brandon Hester, Randy Hamblin, Chris and Kyle Ashley, and Shawn North. (Although the state's witnesses do not identify North as being part of the group on April 14, 2003, the defense witnesses state that he was there.) Barth mentioned at the house that Hubbard and Sickles were in his van and that they were going to the trestle.
 {¶ 8} Barth parked his van at the Lower Valley Pike side of the trestle. Leaving their fishing poles in the van, the three went onto the trestle and stopped at a point near the middle. After talking for a time, Hubbard, Sickles and Barth saw the "Snyderville group" walking to the trestle from the Snyderville side. Barth and Sickles went down to the water from the middle of the trestle by going through a hole onto a concrete slab and climbing down a tree or a dam of logs.
 {¶ 9} While Hubbard remained seated near the middle of the trestle, changing his shoes, Hamblin, Hester, North, Barnett and the Ashleys walked past Hubbard toward the Lower Valley Pike end of the trestle. According to Hubbard, as Spencer walked past, he kicked Hubbard in the chin. Hubbard responded by punching Spencer in the face. Farris, who was near Spencer and Hubbard, then struck Hubbard in the face with a metal pipe. Hubbard fell to the trestle, and Spencer and Farris continued to attack him. Hubbard yelled for help and tried to run toward the van. Upon hearing the cry for help, Sickles and Barth began to climb up from below the trestle. Barth reached the top first, and he observed Hubbard trying to run toward the Lower Valley Pike end of the trestle. Barth stated that Farris, Spencer and Barnett were chasing Hubbard, swinging and kicking at him. Farris was swinging a pipe; Spencer had "a pretty good sized log". Spencer tripped Hubbard, causing him to hit his chin on a concrete slab. Upon reaching the top of the trestle, Sickles observed Spencer hitting Hubbard with a large tree branch or a log and Farris hitting Hubbard with a pipe. Other teenagers were punching and kicking Hubbard.
 {¶ 10} Hubbard got up, ran to Barth's van and tried, unsuccessfully, to start it. Sickles arrived shortly thereafter. Barth, who stopped to exchange some "choice words" with the Snyderville group, arrived a minute or two later. Barth drove the trio directly to Mercy Hospital, where Hubbard was treated in the emergency room. As a result of the encounter on the trestle, Hubbard's jaw was broken on both sides, he lost teeth, his hand was cut, and he suffered cuts to his chin and tongue.
 {¶ 11} In his defense, Farris testified on his own behalf and he presented the testimony of Hamblin, Hester, Barnett, and Spencer. The witnesses denied having gone to Hubbard's home in the Fall of 2002 to fight with him. With regard to April 14, 2003, they each denied being at the home of Jennifer and Nicole Barnett, and they indicated that they did not see Hubbard, Barth and Sickles prior to arriving at the trestle. The defense witnesses testified that they had played basketball in the afternoon at Hamblin's home, and then had decided to go to the trestle to swim in the river. The group walked through the woods to the trestle from the Snyderville area.
 {¶ 12} According to the defense witnesses, when they arrived at the trestle, Hubbard was seated near the middle of the trestle; Sickles and Barth were sitting up on the trestle beams. Hester, the Ashleys, and North walked past Hubbard to the Lower Valley Pike end of the trestle to read a sign there. Farris and Barnett testified that they stopped near Sickles and Barth; Farris, Barnett, Barth and Sickles each jumped into the water. Spencer began to argue with Hubbard. At that time, Hamblin walked past the argument toward the Lower Valley Pike end of the trestle. According to Spencer, Hubbard began to fight with him, and they exchanged blows for several minutes. Spencer further stated that Hubbard had swung a pipe at him. When Spencer began to get the upper hand, Hubbard ran toward Barth's van but tripped at the end of the trestle. Several defense witnesses testified that Farris and Barnett came out of the water after the fight had concluded. Hubbard drove off in Barth's van and then returned for Barth and Sickles. The Snyderville group left the trestle shortly after the fight.
 {¶ 13} Upon review of the record, we have no difficulty finding that the state presented sufficient evidence to withstand a Crim.R. 29 motion. R.C. 2903.11(A)(2) states that a person who knowingly causes or attempts to cause physical harm to another by means of a deadly weapon or dangerous ordnance has committed felonious assault. (In the indictment, Farris was charged solely with "knowingly caus[ing] physical harm" to Hubbard.) R.C.2923.11(A) defines a deadly weapon as "any instrument, device, or thing capable of inflicting death, and designed or specially adapted for use as a weapon, or possessed, carried, or used as a weapon." Here, Hubbard testified that Farris had hit him on his jaw with a metal pipe shortly after Spencer had kicked him on the chin at the middle of the trestle. In addition, Barth testified that, when he returned to the trestle from below, he observed Farris running after Hubbard, swinging a pipe. Sickles further testified that Farris had continued to hit Hubbard with the pipe after Hubbard had fallen at the end of the trestle. Such testimony is sufficient to sustain a conviction for felonious assault.
 {¶ 14} Moreover, we cannot conclude that the jury clearly lost its way when it convicted Farris of felonious assault. Hubbard, Sickles and Barth each testified that they went to the Barnett home before going to the trestle and that the Snyderville group was aware that they were going there. Hubbard's testimony provided a reasonable basis for the jury to conclude that there was "bad blood" between Farris and him. In addition, Spencer had testified that he had several confrontations with Hubbard prior to the incident on the trestle. Thus, a reasonable jury could have concluded that the Snyderville group went to the trestle to fight Hubbard. Barth and Sickles testified as to how they were able to climb under the trestle via the cement slab and the trees or logs. Moreover, considering the fact that the events took place in mid-April, a reasonable jury could have concluded that, despite the relatively warm air temperature, the teenagers had not gone to the trestle to swim and that Sickles and Barth had gone under the trestle merely to check if the water was suitable for fishing.
 {¶ 15} As to the fight itself, Hubbard expressly testified that Farris had hit him in the face with a pipe. Barth's and Sickles's testimonies regarding what they saw when they returned to the top of the trestle were consistent with Hubbard's testimony that he had continued to be attacked at the end of the trestle. Barth testified that, after Hubbard had called for help, he saw Farris chasing Hubbard while swinging a pipe at him. Sickles, who climbed up after Barth, testified that he saw Farris hit Hubbard with the pipe at the end of the trestle. Thus, the jury could have reasonably found that the state's witnesses' stories were consistent in all relevant respects. Moreover, in light of the severe injuries that Hubbard suffered, a reasonable jury also could have concluded that those injuries did not result from a simple fist-fight and a fall at the end of the trestle.
 {¶ 16} Finally, Farris emphasizes that Spencer acknowledged that he alone hit Hubbard and that Sickles and Barth testified that they had not actually fished at the trestle whereas they indicated in their statements given at the hospital that they had been fishing. We acknowledge that, based on this evidence, the jury could have concluded that Farris was not involved in the altercation on the trestle and that Sickles and Barth had changed their stories. However, the jury was not required to credit the testimony of Spencer, Farris, and their friends nor to discredit the testimony of Sickles, Barth, and Hubbard. We afford great deference to the factfinder's credibility determinations. SeeState v. Sherrill (Jan. 28, 2000), Montgomery App. No. 17359;State v. Reed, 155 Ohio App.3d 435, 445, 2003-Ohio-6536,801 N.E.2d 862. In addition, the jury could have reasonably discredited much of the defense witnesses' version of events, including that the Snyderville group had not seen Barth, Sickles or Hubbard before coming to the trestle, that they had come to the trestle in mid-April to swim, that Hubbard drove off in Barth's car, and that Hubbard's injuries resulted solely from the fistfight and the fall at the end of the trestle. Thus, we cannot conclude that the jury clearly lost its way in reaching its conclusions. Accordingly, upon review of the record, Farris's conviction was not against the manifest weight of the evidence.
 {¶ 17} The first and fourth assignments of error are overruled.
 {¶ 18} "The defendant was unfairly prejudiced by the state's lack of investigation."
 {¶ 19} In his second assignment of error, Farris contends that the state failed to investigate the felonious assault charge fully and that, as a result, exculpatory evidence was not recovered. Specifically, Farris criticizes the state's failures (1) to interview the defendant or any defense witnesses; (2) to explore inconsistencies in the state's witnesses' statements; (3) to search for the weapon; (4) to evaluate and search the trestle for evidence; and (5) to verify the witnesses' statements, such as what clothes they had worn, whether they had wet clothes, and whether the Snyderville group had gone to the Barnett home. Farris further argues that he was not made aware of the charge against him until such time that he could not gather the evidence himself. He also claims that serious threats by Hubbard to him after the fight "should have generated some interest and action on the part of the Sheriff's office." Farris thus argues that these alleged failures to investigate "precluded Defendant from obtaining a fair trial and resulted in the conviction of an innocent man."
 {¶ 20} We find no merit to Farris's arguments. Under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, the state must disclose material evidence favorable to the defendant. Brady v. Maryland (1963), 373 U.S. 83,83 S.Ct. 1194, 10 L.Ed.2d 215. The Due Process Clause further protects a criminal defendant from being convicted where the state has failed to preserve materially exculpatory evidence or destroys in bad faith potentially useful evidence. State v.Bolden, Montgomery App. No. 19943, 2004-Ohio-2315, at ¶ 51. However, the state has no duty to gather such exculpatory evidence. See State v. Franklin, Montgomery App. No. 19041, 2002-Ohio-2370 (state had no obligation to procure 911 tape from another state). Rather, when the state has failed to gather exculpatory evidence or to fully investigate the allegations, the defendant may either investigate the charge and collect the evidence himself, if such evidence is available, or he may point out the deficiencies in the state's investigation at trial.
 {¶ 21} Moreover, it is wholly speculative whether the deputy's alleged failure to investigate "has rendered a travesty of justice." In the present case, Hamblin, Hester, Barnett, Spencer, and Farris all testified at trial as to the events on the trestle. Thus, there is no apparent prejudice to Farris due to the sheriff's failure to interview those witnesses. Farris and Spencer testified that he and his friends had looked for the pipe after the fight, but had been unable to find it. Spencer testified that he thought the pipe had fallen into the water. Accordingly, the record suggests that the sheriff likewise would not have found the weapon. With regard to the Hubbard's second threatening telephone message to Farris, Farris testified that a deputy sheriff had listened to the message but that the message was erased before a detective could listen to it. We see no nexus between the deputy's alleged failure to investigate this message further and Farris's conviction for the felonious assault. As for the alleged undiscovered exonerating evidence, we have no basis to determine whether such evidence existed or whether that evidence would have had any effect on the outcome of the trial. Accordingly, we find no merit to Farris's assertion that he was prejudiced by the sheriff's alleged failure to investigate fully.
 {¶ 22} The second assignment of error is overruled.
 {¶ 23} "The court erred in making evidentiary rulings."
 {¶ 24} In his third assignment of error, Farris claims that the trial court erroneously concluded that Barth's and Sickles's written witness statements and the investigating deputy's perceptions of Hubbard at the hospital were not admissible. Farris further claims that the court erroneously permitted hearsay statements regarding Farris's and his friends' alleged visit to Hubbard's grandmother's house for the purpose of "beating him up."
 Admissibility of Written Witness Statements {¶ 25} Farris asserts that the trial court erroneously refused to admit into evidence the witness statements that Sickles and Barth completed at Mercy Hospital and the Probable Cause Affidavit of Deputy Richard Brumfield, the investigating deputy. Farris argues that the statements fall within exceptions to the hearsay rule and are admissible under Evid.R. 613(B).
 {¶ 26} Evidence Rule 613(B) allows the admission of extrinsic evidence of a prior inconsistent statement when: (1) "the statement is offered solely for the purpose of impeaching the witness, the witness is afforded a prior opportunity to explain or deny the statement and the opposite party is afforded an opportunity to interrogate the witness on the statement or the interests of justice otherwise require;" and (2) the subject matter of the statement "is of consequence to the determination of the action other than the credibility of a witness," or otherwise meets the requirements of Evid.R. 613(B)(2). Reed,155 Ohio App. 3d at 442. We have stated that, under this rule:
 {¶ 27} "If the witness admits making the conflicting statement, then there is no need for extrinsic evidence. If the witness denies making the statement, extrinsic evidence may be admitted, provided the opposing party has an opportunity to query the witness about the inconsistency, and provided the `evidence does not relate to a collateral matter[.] * * *' However, if the witness says he cannot remember the prior statement, `a lack of recollection is treated the same as a denial, and use of extrinsic impeachment evidence is then permitted.'" State v.Harris (Dec. 21, 1994), Montgomery App. No. 14343 (citations omitted); see Reed, 155 Ohio App.3d at 442-43.
 {¶ 28} During cross-examination, Farris's counsel attempted to impeach Sickles's direct testimony that he, Barth and Hubbard had left their fishing poles in the van by showing him the statement that he had written for Deputy Brumfield at Mercy Hospital, in which he had stated, "me and Andy went under the bridge and castin are [our] pole in." Sickles acknowledged that he had written that statement, but he tried to explain the discrepancy, saying, "I just was writing down real fast, only took me like two minutes to fill out that statement. That's why it's so sloppy and everything." He admitted that the sentence regarding casting their poles into the water was untrue, but asserted that the rest of his statement was truthful. On redirect, the prosecutor asked Sickles to explain why he had written the statement regarding the casting of the fishing poles. Sickles stated that they had intended to fish at the trestle, that he had hurriedly written his statement, and that he had not purposefully lied.
 {¶ 29} Although the proper foundation had been laid under Evid.R. 613(A) for the admission of the written statement, Sickles admitted to the inconsistency between his statement and trial testimony, and he indicated that he had been untruthful in writing that they had been fishing on April 14, 2003. As stated, supra, "extrinsic evidence of a prior inconsistent statement made by a witness is not admissible if the witness admits making the prior inconsistent statement." State v. Hill, Montgomery App. No. 20028, 2004-Ohio-2048, at ¶ 40.
 {¶ 30} Thus, the written statement was not admissible under Evid.R. 613. Moreover, in light of the thorough cross-examination, during which Sickles was confronted with his prior inconsistent statements, the presentation of written evidence of those statements would have had minimal additional impact on his credibility.
 {¶ 31} Likewise, upon cross-examination, Barth acknowledged that his second statement was "more exact" than the statement he wrote for Deputy Brumfield. Upon being shown his witness statement from the hospital, Barth stated that he had identified who was swinging the pipe in his second statement. He explained that he "didn't realize that [the deputy] wanted exact names of who did what. I just thought he said put what you saw." Barth thereby acknowledged the differences between the statements and attempted to explain them. Thus, the trial court did not err in refusing to admit Barth's written statement into evidence.
 {¶ 32} Farris also argues that Sickles's and Barth's witness statements are admissible under a hearsay exception. Considering that the statements were written several hours after the incident at the hospital, we are unconvinced that the statements are admissible as present sense impressions. Moreover, because Sickles and Barth were able to testify fully about the events of April 14, 2003, at trial, their written statements are not admissible as past recollections recorded. Evid.R. 803(5);Johnson v. Cassens Transport Co., 158 Ohio App.3d 193, 196,2004-Ohio-4011, 814 N.E.2d 545. The public record exception is likewise unavailable. Accordingly, the trial court did not err in refusing to admit Sickles's and Barth's statements as exhibits.
 {¶ 33} As for Brumfield's Probable Cause Affidavit, defense counsel withdrew his request to have the affidavit admitted. Accordingly, that argument has been waived.
 Deputy Brumfield's Testimony {¶ 34} Farris claims that the trial court erred in precluding him from "exploring the present sense impressions" of Deputy Brumfield, who interviewed Hubbard at Mercy Hospital. At trial, defense counsel attempted to obtain the deputy's assessment of Hubbard's mental state at the hospital. The colloquy was as follows:
 {¶ 35} Defense Counsel: "And could you tell what — who the affiant at that point, a Philip Hubbard, was able to, was he lucid at that time, could you tell?"
 {¶ 36} Brumfield: "He was shaken."
 {¶ 37} Defense Counsel: "Shaken. Would you say that, could you tell whether what he stated to you was likely to be accurate or not or could you tell?"
 {¶ 38} The Court: "Counselor, I will not allow him to testify as to an opinion as to the accuracy of someone else."
 {¶ 39} Defense Counsel: "Okay."
 {¶ 40} The Court: "Or the credibility of someone else's statement."
 {¶ 41} Defense Counsel: "All right. Not necessarily talk about his credibility but his observations of the declarant at the time. I think that would be the exception."
 {¶ 42} The Court: "He's testified he wasn't there. He only knows what the declarant told him."
 {¶ 43} Defense Counsel: "All right. Well, I'll move on."
 {¶ 44} On appeal, Farris argues that the deputy's "present sense impressions" fall under an exception to the hearsay rule and, thus, were admissible. However, the hearsay rule is clearly inapposite. The apparent purpose of defense counsel's line of questioning was to elicit the deputy's perception of Hubbard's mental state based on Hubbard's behavior at the hospital, not Hubbard's or Brumfield's out-of-court statements regarding what happened at the trestle. Although we agree that testimony regarding Brumfield's perceptions of Hubbard would be admissible, we find no suggestion that Farris was prejudiced by his counsel's inability to question Brumfield further regarding his perception of Hubbard's mental state. Defense counsel had asked whether Hubbard was lucid when Brumfield talked with him, and Brumfield indicated that Hubbard "was shaken." We find no basis to conclude that further testimony on this issue would have affected the outcome of the trial. Accordingly, any error in this regard is harmless.
 Testimony Regarding the Fall of 2002 Threats {¶ 45} Farris further claims that the trial court erroneously permitted hearsay statements by Hubbard and his grandmother, Anna Hubbard, regarding the Snyderville group's alleged visit to Anna Hubbard's home for the purpose of "beating up" Hubbard.
 {¶ 46} During his direct examination, Hubbard had testified that he and Farris had a conflict over Nicole Barnett: "We had words. We had words. He came to my house trying to fight me, him and a whole bunch of his friends; and I wasn't at home. I was at my mother's house; and I told him, I called him and I told him if he wanted to fight me, I'd fight him on —." Defense counsel raised a hearsay objection. The court overruled the objection, reasoning that Hubbard could "give the explanation as to why he called the Defendant. Whether or not anybody was actually there, the jury cannot accept the statement he's given from some third party as being true. He can only give that statement as to why he made the phone call because he was told that."
 {¶ 47} Shortly thereafter, Hubbard testified that he had told Farris that he would fight him, "[b]ecause they came to my house trying to fight me * * *." After defense counsel again objected, the trial court gave a cautionary instruction: "Ladies and gentlemen, what this man is being told by his grandmother is only allowed in to explain why he acted the way he did. You cannot accept what his grandmother told him happened as being true, only the basis for his future actions."
 {¶ 48} During the state's rebuttal case, Anna Hubbard testified that, while Hubbard was preparing to go to his mother's home, the telephone rang. She stated that, after Hubbard hung up, he told her "Grandma, that was Jason. He says they're coming to beat me up." The court overruled an objection to that testimony, explaining, "I will allow the testimony only for the purpose of explaining what she may have done subsequent to that call. What may or may not have been said on the telephone, whether or not what she was told is truthful or not cannot — her statement cannot be used to make that determination. The jury is not to consider that statement from Phil for the truth of the matter asserted, but only as to why she may have or may not have done something following that conversation."
 {¶ 49} In our judgment, the trial court appropriately and adequately instructed the jury as to the purposes for which it could consider the alleged objectionable testimony. We presume that the jury followed the trial court's limiting instruction. We find no error concerning the trial court's treatment of Hubbard's and his grandmother's testimony.
 {¶ 50} The third assignment of error is overruled.
 {¶ 51} "Defendant received ineffective assistance of counsel during his trial."
 {¶ 52} In his fifth assignment of error, Farris claims that he was denied the effective assistance of counsel. In order to demonstrate ineffective assistance of counsel, Farris must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance. Strickland v.Washington (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674;State v. Bradley (1989), 42 Ohio St. 3d 136, 538 N.E.2d 373. Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance. SeeStrickland, 466 U.S. at 689. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See id.; State v. Parker,
Montgomery App. No. 19486, 2003-Ohio-4326, ¶ 13.
 {¶ 53} First, Farris claims that his trial counsel should have moved for an acquittal at the close of the state's case-in-chief. As discussed, supra, Farris did not waive his right to challenge the sufficiency of the state's case on appeal, and the state presented sufficient evidence in its case-in-chief to support the felonious assault conviction. Accordingly, Farris's trial counsel was not deficient in this regard.
 {¶ 54} Second, Farris asserts that he has been prejudiced by his trial counsel's withdrawal of his request to submit Defense Exhibits A, B, and C. As discussed above, the trial court properly declined to admit Defense Exhibits A and B, i.e., the witness statements of Barth and Sickles. Moreover, trial counsel had ample opportunity to question Barth, Sickles, and Deputy Brumfield regarding the statements during cross-examination. We find no basis to conclude that the admission of the written statements themselves, after being the subject of cross-examination, would have materially affected the outcome of the trial.
 {¶ 55} Third, Farris claims that his trial counsel rendered ineffective assistance when he failed to present evidence to support Farris's assertion that Hubbard had left a threatening telephone message, in which Hubbard had allegedly said that he had Farris's radio, liked his CD's, would blow up Farris's house, and would rape his little sister. Farris had testified that Hubbard had left this telephone message about a week after Hubbard's previous threat to fight him. (Hubbard testified that the first telephone message was in response to Farris's and his friend's visit to his grandmother's house to "beat him up.") Farris claims that "this would have been compelling testimony showing the character of the victim and his possible agenda to wreak havoc in the life of the Defendant."
 {¶ 56} Although Farris's counsel could have attempted to introduce additional evidence of Hubbard's second threatening telephone call, the decision not to offer that evidence was a matter of trial strategy. Even debatable trial tactics do not establish ineffective assistance of counsel. State v. Hoffner,102 Ohio St.3d 358, 365, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 45;State v. Clayton (1980), 62 Ohio St.2d 45, 402 N.E.2d 1189. Moreover, even if the jury had been presented with additional information about the second threatening telephone call, Farris had testified that the second call "was the last I heard [from Hubbard] before that incident at the trestle." Thus, it is mere speculation whether the jury would have concluded that the second call, which occurred six months prior to the incident on trestle, demonstrated an "agenda to wreak havoc" on Farris's life.
 {¶ 57} Fourth, Farris complains that, during closing argument, his attorney suggested that all of the teenaged witnesses — state and defense — had equal reason to lie for their friends. Farris asserts that his counsel should have distinguished Spencer, arguing that Spencer "clearly had no reason to take or accept full responsibility for the events of the day if Farris had also been involved." Although Farris's counsel could have emphasized that Spencer's acceptance of responsibility rendered him more credible, counsel's closing argument is not evidence, and we will not second-guess Farris's trial counsel's tactical decisions regarding which testimony to highlight during his closing argument. We find no basis to conclude that Farris's counsel's closing argument fell below an objective standard of reasonableness.
 {¶ 58} Fifth, Farris argues that his counsel should have had the principal of his school testify regarding Hubbard's "pattern of some outrageous and provocative behavior." During his direct testimony, Spencer had testified that he had had several confrontations with Hubbard before the incident at the trestle, including a run-in at the bowling alley, a visit by Hubbard to Spencer's and Farris's school in February 2003, and a visit by Hubbard to Snyderville with a group of friends and dogs in order to fight. Spencer also testified that Hubbard had gone to his school a couple of weeks after the incident on the trestle. Spencer stated that, after the April 2003 incident, Hubbard "came to the school accusing us that we had jumped him and stuff and trying to start another fight."
 {¶ 59} "The failure to present the testimony of a witness or other evidence at trial is not a substantial violation of an essential duty to a defendant unless it is shown that the evidence would have assisted the defense." State v. Payne (Mar. 1, 1996), Greene App. No. 95-CA-49. The only hint in the record of the principal's anticipated testimony was provided by Spencer. Based on Spencer's comment regarding Hubbard's visits to his school, the principal might have been able to support Spencer's testimony that Hubbard had had confrontations with him prior to April 2003, which refutes Hubbard's testimony that he had "not had any conflict with [Farris] or any of his friends" since the Fall of 2002. However, Spencer's testimony also indicates that Hubbard came to the school after the incident, claiming that he had been "jumped" by Spencer and his friends. Thus, the principal's testimony might have supported Hubbard's version of the events. Because we can only speculate as to the principal's testimony, whether that testimony would have been favorable to the defendant, and the testimony's impact on the jury, we cannot conclude that the failure to call the principal to testify was prejudicial to Farris.
 {¶ 60} Sixth, Farris asserts that his counsel was ineffective by failing to request the separation of witnesses during trial. Although it is good practice to move for separation of witnesses, we are unwilling to conclude that counsel is deficient, per se, by failing to do so. See State v. Freeman (May 3, 1991), Montgomery App. No. 12198. Moreover, we are unable to discern from the record whether the state's witnesses had altered their testimony due to their ability to hear prior witnesses. Thus, we cannot conclude that the testimony and the outcome of the trial would likely have been different.
 {¶ 61} The fifth assignment of error is overruled.
 {¶ 62} "Defendant was prejudiced by improper comments by the prosecutor throughout the trial, and particularly in the closing argument."
 {¶ 63} Farris claims that the state engaged in prosecutorial misconduct throughout the trial, particularly during the state's closing argument. In analyzing claims of prosecutorial misconduct, the test is "whether remarks were improper and, if so, whether they prejudicially affected substantial rights of the accused." State v. Jones, 90 Ohio St.3d 403, 420,2000-Ohio-187, 749 N.E.2d 300, citing State v. Smith (1984),14 Ohio St.3d 13, 14, 470 N.E.2d 883. "The touchstone of analysis `is the fairness of the trial, not the culpability of the prosecutor.'" Id., quoting Smith v. Phillips (1982),455 U.S. 209, 219, 102 S.Ct. 940, 947, 71 L.Ed.2d 78. Where it is clear beyond a reasonable doubt that a jury would have found the defendant guilty even absent the alleged misconduct, the defendant has not been prejudiced, and his conviction will not be reversed. See State v. Loza (1994), 71 Ohio St.3d 61, 78,1994-Ohio-409, 641 N.E.2d 1082. In reviewing allegations of prosecutorial misconduct, we review the alleged wrongful conduct in the context of the entire trial. Darden v. Wainwright
(1986), 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144.
 {¶ 64} Generally, prosecutors are entitled to considerable latitude in opening statement and closing argument. State v.Ballew, 76 Ohio St.3d 244, 255, 1996-Ohio-81, 667 N.E.2d 369;State v. Stevens, Montgomery App. No. 19572, 2003-Ohio-6249, ¶ 34. In closing argument, a prosecutor may comment freely on "what the evidence has shown and what reasonable inferences may be drawn therefrom." State v. Lott (1990), 51 Ohio St.3d 160, 165,555 N.E.2d 293, quoting State v. Stephens (1970),24 Ohio St.2d 76, 82, 263 N.E.2d 773. "Moreover, because isolated instances of prosecutorial misconduct are harmless, the closing argument must be viewed in its entirety to determine whether the defendant has been prejudiced." Stevens, supra, citing Ballew, supra, andState v. Lorraine (1993), 66 Ohio St.3d 414, 420,613 N.E.2d 212.
 {¶ 65} Farris complains that the prosecutor misinformed the jury about the elements that the state must prove by stating, "We don't have an obligation to prove that the pipe caused his jaw to break or the fall. He's running from this guy and he falls and breaks his jaw and gets injured or whatever." No objection was made at trial. Although this segment, taken alone, implies that the state need not prove causation, our review of the entirety of the state's closing argument does not convince us that the prosecutor denied having to prove that Farris caused physical harm to Hubbard. Specifically, the prosecutor stated:
 {¶ 66} "What is the felonious assault? You knowingly cause physical harm to another by means of a deadly weapon. Now, what's that mean? It's pretty simple."
 {¶ 67} "You know when you take a pipe to someone's face, you may cause harm and he did. It's that simple. Slap somebody with a pipe upside the head, you may cause physical harm. Is it necessary for me to show that he may cause physical harm? No, just that he caused some type of physical harm. We don't have an obligation to prove that the pipe caused his jaw to break or the fall. He's running from this guy and he falls and breaks his jaw and gets injured or whatever. Just that physical harm was caused. I don't even think we need to go over this any more than that. That's the elements of this trial. That's the elements of this crime; and it's pretty much been proven that Phil Hubbard was caused physical harm; and I think it's pretty much proven that he suffered it from this deadly weapon."
 {¶ 68} Upon review of the closing argument, the prosecutor appropriately acknowledged that the state was required to prove that Farris had caused physical harm to Hubbard by means of a deadly weapon (i.e., the pipe) but also had tried to clarify, albeit inartfully, that the state was not required to prove that a particular harm resulted. Furthermore, the trial court had previously instructed the jury that the closing arguments were not evidence. The court subsequently instructed the jury as to the state's burden to establish causation. Even if we were to accept that the prosecutor's comment was improper, we do not agree that the statement resulted in an unfair trial.
 {¶ 69} We also do not find fault with the prosecutor's statements that "they went there to go fishing" and that the boys could not go swimming in Clark County on that day. Hubbard, Sickles and Barth each had testified that they had gone to the trestle to fish. Although there was evidence that the air temperature was approximately 74 degrees, the prosecutor was free to argue that the jury could reasonably infer that the water would have been too cold for swimming, particularly since the events occurred in mid-April following a snowy winter. Moreover, the prosecutor was free to emphasize the consistencies in the testimony of the state's witnesses. Finally, we find no merit to Farris's argument that the prosecutor's failure to mention that Barth was also eighteen years of age had any effect on Farris's rights.
 {¶ 70} The sixth assignment of error is overruled.
 {¶ 71} Having overruled each of the assignments of error, the judgment of the trial court will be affirmed.
Brogan, J. and Young, J., concur.