DECISION AND JUDGMENT ENTRY
{¶ 1} This appeal comes to us from a judgment issued by the Ottawa County Court of Common Pleas, Juvenile Division, which adjudicated appellant to be a delinquent child. Because we conclude that the appellant received a fair hearing and effective assistance of counsel, we affirm the trial court's judgment.
 {¶ 2} Appellant, Josh M., was originally charged with three complaints, one alleging rape and two alleging gross sexual imposition involving two younger girls. The complaints were based upon incidents which allegedly occurred in July 2002 between appellant, then age 16, and two sisters, "Jane,"[1] then age 12, and "Jill," then age 10, in a four-feet deep above-ground swimming pool located in the backyard of the girls' residence. During a two day hearing, testimony was presented that appellant and his younger brother, "David," then age 14, were friends of the girls' older brother, "John," age 15, and were visiting at the home located in Ottawa County, Ohio, where John and the girls resided with their parents. The three boys were taking a midday break from hay baling at a local farm, where they all worked together. John napped in the house while appellant, his brother, and the girls all decided to swim in the pool located in the backyard.
 {¶ 3} Both girls testified that after playing "Truth or Dare," the boys asked 12 year-old Jane to take off her bathing suit top. Jane said that when she refused, appellant allegedly grabbed several times at and succeeded in removing her top, and then tossed it around the pool with his brother. Jane said that David then held onto her while appellant tried to pull down the bottom of her suit. Jane said she prevented the boys from pulling her suit bottom all the way down and eventually David threw back her top which she put on. As a result of this, Jane was embarrassed and decided to go into the house, asking her younger sister to also leave the pool. Allegedly at appellant's request, Jill stayed in the pool. According to the girls, David also left at that point, riding away on his dirt bike or four-wheeler. Jane did not tell anyone about what had happened, even though her mother, father and an older adult sister were home at the time. Jane said she now regretted leaving her sister in the pool, but at the time did not think appellant would do anything to her because she was so young.
 {¶ 4} Ten year old Jill testified that when the boys were trying to remove her sister's top, she had jumped onto appellant's back, hitting him in an attempt to stop him. Although Jill saw her sister's top was removed, she did not see the bottom of her sister's suit being pulled down. She said that after Jill got her top back, she helped to retie it. Although Jan left the pool and asked her to come in the house with her, Jill decided to stay when appellant said he wanted to stay and swim. Jill acknowledged, at one point, that she had had a "crush" on appellant, and had kissed him on a dare several weeks earlier.
 {¶ 5} Jill then said that David also left the pool and she and appellant began playing a game in which each took turns swimming underwater between the other's open legs without touching them. Jill said, that on one of appellant's turns, he put his finger under her swimsuit bottom and into her vaginal area. When she reacted in surprise and dismay at his behavior, appellant apologized and asked her to stay in the pool. The two then continued to swim around, and Jill said she thought appellant's act was just an accident.
 {¶ 6} Appellant then allegedly asked her for two hair bands which she had on her wrist. According to Jill, appellant turned his back and "fidgeted" with the bands. When he turned around, she saw that he had placed the bands on his penis. Appellant allegedly asked her to remove the bands, threatening to "spread rumors" about her if she did not do as he asked. Jill then complied, and appellant then allegedly asked her to place her mouth on his penis underwater. When she refused, he again said he would spread rumors about her around school. Jill said appellant held her head under water until she placed her mouth on his penis; this occurred three or four times. According to Jill, the incidents were interrupted when her brother, John, approached the pool to tell appellant that they had been called back to work. Appellant told Jill not to tell anyone what had happened and then left the pool. As the two boys were leaving to return to work, appellant allegedly called Jill over to him from where she was standing on the porch, and again admonished her not to tell anyone.
 {¶ 7} Although the sisters discussed the incidents with each other that evening, the two did not disclose the events to anyone else until approximately six months later. They said they did not tell their parents when it happened because their father had suffered four heart attacks and was in ill health, because they did not want to hurt the long-standing friendship between John and David, and because they were embarrassed and afraid of appellant. About two weeks before Christmas, Jane told a friend, Mary, appellant's cousin, who then told the girls' brother, John. Appellant eventually heard what had been disclosed and called the girls numerous times on Christmas Eve, saying he would "call the cops" if they did not stop spreading rumors about him.
 {¶ 8} The girls' mother also testified, stating that the pool was approximately 90 feet from the back of the house. She said she would usually check on the children in the pool by looking out the patio window. Mother said she could not see into the pool, but would "count heads." Mother remembered that on the day of the incident, after leaving the pool, Jill stood near her mother, shivering even after taking a hot bath. Mother said Jill stayed so close to her, that she remembered being annoyed and telling her to get out of her way. Mother also saw appellant say something to Jill as he was going to his car that day, but when asked what he said, her daughter replied that she did not remember.
 {¶ 9} Mother testified that she first learned of the incidents on Christmas Eve, six months later. Her daughters became more and more agitated that night in response to several telephone calls from appellant. Mother asked the girls what was going on and, at one point, spoke with appellant on the phone, telling him to stop calling because he was interrupting their family gathering. As soon as the girls' mother hung up the phone, Jill burst into tears and the girls then disclosed the swimming pool incidents.
 {¶ 10} Mother then testified that a couple days later she contacted appellant's parents and met with them so that the girls could tell them directly what had happened. At the meeting, appellant's parents did not act as if they believed the girls. Mother stated that she initially just wanted appellant to get treatment, but when she never heard back from the parents after the meeting, she decided to report the incidents to authorities. She stated that the girls were both in counseling and remained afraid of appellant. The state then rested and appellant moved for acquittal as to the gross sexual imposition regarding Jane, which was denied. Appellant then presented testimony in his defense.
 {¶ 11} Appellant's mother testified that she remembered doing a lot of driving on the day of the alleged incidents and was angry with the boys for stopping to swim at John's house instead of coming home. She indicated that it made an extra trip for her to have to pick them up. Regarding the incidents on Christmas Eve, appellant's mother said appellant had been talking on the telephone several times, but she did not know with whom. Later that evening, she looked for and found appellant alone in their laundry room, distraught after talking with the girls. He said he was upset and told his mother what the girls had been saying about him. Appellant's mother said she called the girls' mother the next day and agreed to meet with them. She said that Jill did not seem as upset as Jane when talking about the incidents. Appellant's mother said she was confused and frustrated when trying to understand the girls, because Jill said she had complied with appellant's requests because he had given her "that look." Appellant's mother did not know what "look" she was talking about.
 {¶ 12} Appellant's mother further testified that she did not believe the allegations about her son, or that he was capable of such actions. She said that appellant is hard working and was basically a good child. She acknowledged that he was not doing well in school and had had some problems, but that he was currently employed and had future plans to work as a boilermaker's apprentice.
 {¶ 13} David, appellant's younger brother, testified that on the day of the incidents, he changed into a pair of John's swim trunks. Appellant had on shorts and underwear. David said that he did not ride his dirt bike to the house that day, but that John's mother had picked them all up and brought them to the house to cool off. He stated that John was asleep in the house and that this was the only time appellant had gone swimming at John's home. He also acknowledged that he had untied Jane's bathing suit top during "horse play," but said she was able to retie it before anyone "saw anything." He denied restraining Jane or that they had tried to remove her suit bottom. David said that appellant was never alone with either of the girls in the pool and that the four left the pool at the same time.
 {¶ 14} Appellant denied ever being alone with either girl or that he had touched either of them in an erogenous area. He said that the girls asked him and David to go swimming with him. Appellant said that David had changed into a pair of John's swim trunks, but that he himself had worn loose basketball shorts and underwear, which he had on under his jeans. He said that while the four were swimming, David had untied Jane's top, but Jill had helped to retie it before anything was revealed. He denied any of the conduct alleged by Jill. Appellant said that he knew Jill had a crush on him, that she had kissed him on the cheek on a dare from others, but that he had refused to kiss her back.
 {¶ 15} Appellant also stated that he did not drive to John's house that day, but could not remember how he had gotten to work. Both brothers stated that after swimming, their mother came to the house to pick them up so they could change clothes before going back to work. Appellant denied threatening Jill on the day of the incidents, but said Mary had told him what the girls were saying about him. He said the girls had called him first on Christmas Eve, but then he also phoned the girls, telling them that he would call the police if they did not stop "spreading rumors" about him. Appellant then rested his case.
 {¶ 16} On rebuttal, John, the girls' brother, testified that, prior to Christmas Eve 2002, he had been best friends with David, appellant's younger brother, for several years. John said that on the day of the incident he had been asleep in the house while his sisters, appellant, and David were swimming. John also testified that when he came out to tell appellant that they had been called back to work, appellant and Jill were alone in the pool together. John said that he and appellant left to go back to work in appellant's car. John also testified that Mary told him about the pool incident approximately two weeks before Christmas, but he did not know what to do about it. He stated that his friendship with David ended as a result of the disclosure.
 {¶ 17} The court ultimately found that the state failed to prove that appellant had sexual contact with the 12 year old, but found that he did engage in sexual conduct with the 10 year old. The court adjudicated appellant a delinquent child based upon conduct which if committed by an adult would be rape, a violation of R.C. 2907.02(A)(1)(b) in case No. 20320329, and dismissed the two remaining cases.
 {¶ 18} Appellant now appeals from that judgment, setting forth the following three assignments of error:
 {¶ 19} "Assignment of Error No. 1
 {¶ 20} "The trial court committed prejudicial error when it adjudicated Appellant a delinquent child where the State failed to prove venue beyond a reasonable doubt.
 {¶ 21} "Assignment of Error No. 2
 {¶ 22} "The trial court committed prejudicial error in adjudicating Appellant delinquent where the finding is against the manifest weight of the evidence.
 {¶ 23} "Assignment of Error No. 3
 {¶ 24} "Defense counsel's performance of his duties was deficient in that he made errors so serious that he failed to function as the counsel guaranteed by the [S]ixth [A]mendment and Appellant was prejudiced by said errors."
 I. {¶ 25} In his first assignment of error, appellant argues that the state failed to prove venue because no testimony specifically indicated that site of the alleged rape, the pool, was in Ottawa County.
 {¶ 26} Our review of the record reveals that the girls' mother and the Jane testified that their residence was located in Ottawa County and the pool was located in the backyard of that residence. Jill testified that the incidents involving her took place in the pool. In this case, a reasonable inference may be drawn that the pool is on residential property located in Ottawa County. No evidence in the record suggests otherwise. Therefore, appellant's argument that the state did not establish venue is without merit.
 {¶ 27} Accordingly, appellant's first assignment of error is not well-taken.
 II. {¶ 28} In his second assignment of error, appellant asserts that the trial court's delinquency finding was against the manifest weight of the evidence.
 {¶ 29} Due process affords juveniles the same protections afforded criminal defendants, notwithstanding the civil nature of juvenile proceedings. In re John A.S., 6th Dist. No. E-04-029, 2004-Ohio-6881, at ¶ 10; In the Matter of: Jesse A.C. (Dec. 7, 2001), 6th Dist. No. L-01-1271. Accordingly, "we review juvenile delinquency adjudications using the same weight and sufficiency standards that we would use for criminal defendants." Id. A juvenile, like an adult, is constitutionally entitled to have every element of a charged crime proved beyond a reasonable doubt. See In re Winship (1970), 397 U.S. 358, 365.
 {¶ 30} A challenge to the weight of the evidence attacks the credibility of the evidence. See State v. Thompkins, 78 Ohio St.3d 380,387. The reviewing court sits, essentially, as a "`thirteenth juror' and [may] disagree with the fact finder's resolution of the conflicting testimony." Id., quoting Tibbs v. Florida (1982), 457 U.S. 31, 42. When evaluating the manifest weight of the evidence in a juvenile case, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the adjudication must be reversed and a new trial ordered. SeeThompkins, supra.; State v. Martin (1983), 20 Ohio App.3d 172, 175.
 {¶ 31} R.C. 2907.02(A)(1)(b) provides that
 {¶ 32} "(A) (1) No person shall engage in sexual conduct with another who is not the spouse of the offender or who is the spouse of the offender but is living separate and apart from the offender, when any of the following applies:
 {¶ 33} "* * *
 {¶ 34} "(b) The other person is less than thirteen years of age, whether or not the offender knows the age of the other person."
 {¶ 35} "Sexual conduct" is defined as "vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal cavity of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse." R.C. 2907.01(A).
 {¶ 36} In this case, Jill testified that appellant inserted his finger into her vagina and that she was forced to place her mouth on his penis. Either of those actions constitutes "sexual conduct." Our review of the record reveals that, although Jill's testimony may have included some minor discrepancies, there was nothing contradictory or unbelievable in her statements. Portions of Jill's version were corroborated by both her brother, who saw her alone in the pool with appellant, and her mother, who described her talking to appellant as he was leaving to go back to work. We also find it credible that the girls did not disclose the incidents until circumstances brought the issues to light six months later. At the time the incidents occurred, the concern for their father's health and the friendship between their brother and appellant's younger brother, the embarrassment, fear, and the alleged threats from appellant who was older and bigger were all compelling and logical reasons for the children to want to hide what had allegedly occurred.
 {¶ 37} In reviewing appellant's and his brother's testimony, the record reveals some inconsistencies or gaps in memory. Appellant's brother, David, said that on the day of the incidents, he changed into John's swim suit, which presumes that he then had dry clothing to change back into. Nevertheless, he stated that he and appellant were picked up by their mother so that they could go home and change into fresh clothing to await the call back to work by their boss. Appellant clearly remembered that their mother had picked them up from John's house after swimming, but did not remember how he had gotten to work that day. Both boys also denied any wrong doing in the pool, but still acknowledged that there was a successful attempt and removal of Jane's bathing suit top.
 {¶ 38} Upon consideration of the entire record, we cannot say that the trier of fact lost her way and that a manifest miscarriage of justice occurred. Credible testimony and evidence were presented which support a finding that appellant did engage in sexual conduct with a person under thirteen years of age. Therefore, the trial court's decision was not against the manifest weight of the evidence.
 {¶ 39} Accordingly, appellant's second assignment of error is not well-taken.
 III. {¶ 40} In his third assignment of error, appellant argues that his trial counsel committed errors which denied him his constitutional right to effective assistance of counsel. Essentially, appellant asserts that counsel failed to call a witness which would have shown that the girls changed their version of the events, failed to cross-examine the girls about these different versions, and failed to retain an expert witness to demonstrate that appellant does not fit the profile of being a sex offender and was unlikely to commit the crimes with which he was charged.
 {¶ 41} To establish an ineffective assistance of counsel claim, a defendant must show that counsel's performance fell below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance." State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus (Strickland v. Washington (1984), 466 U.S. 668
followed.) "To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must prove that there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." Bradley, supra, at paragraph three of the syllabus. Ohio law presumes a licensed attorney is competent. Vaughn v. Maxwell (1965), 2 Ohio St.2d 299, 301. Further, there is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Bradley, supra, at 142 quoting Strickland, supra, at 689. Appellant first claims that trial counsel was deficient because appellant's cousin, Mary, should have been called to testify that the girls changed their versions of the incidents several times when talking to her. Counsel's decision in not calling Mary as a defense witness could well have been a tactical decision which does not necessarily rise to the level of ineffective assistance of counsel. See State v. Jackson (2001), 97 Ohio St.3d 436, 447. Moreover, hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. See State v. Mason (1998),82 Ohio St.3d 114, 157-158; State v. Parker, 2d Dist. No. 19486, 2003-Ohio-4326, ¶ 13. "The failure to present the testimony of a witness or other evidence at trial is not a substantial violation of an essential duty to a defendant unless it is shown that the evidence would have assisted the defense." State v. Farris, 2d Dist. No. 2003-CA-77,2004-Ohio-5980, at ¶ 59; State v. Payne (Mar. 1, 1996), 2d Dist. No. 95-CA-49.
 {¶ 42} In this case, we have no evidence of what Mary may have said under oath. Although appellant attached to his brief a letter allegedly sent by Mary to the trial court, it was never entered on the record of the proceedings. Consequently, we may not consider such evidence. SeeState v. Ishmail (1978), 54 Ohio St.2d 402, paragraph one of the syllabus (reviewing court may not add to the record and decide appeal on the basis of new matter which was not a part of the trial court's proceedings). Furthermore, even presuming that Mary would have testified that the girls' versions varied, nothing in the letter or the record indicates that the changes were material to the girls' overall credibility.
 {¶ 43} Appellant also asserts that trial counsel failed to cross-examine the girls regarding the differences in their versions told to Mary. Counsel did question the girls about differences in the statements made to the children services worker and the police. Again, we can find nothing material or so conflicting in the statements so as to negate the girls' testimony.
 {¶ 44} Finally, appellant argues that counsel should have retained an expert witness to testify that appellant did not fit the profile of a sex offender. Expert testimony is admissible where it will assist the trier of fact in understanding matters "beyond the knowledge or experience possessed by lay persons or [it] dispels a misconception common among lay persons[.]" Evid.R. 702(A). The decision whether to call an expert witness is solely a matter of trial strategy. State v. Coleman (1989),45 Ohio St.3d 298, 307-08. A decision by counsel not to call an expert witness generally will not sustain an ineffective assistance of counsel claim. State v. Thompson (1987), 33 Ohio St.3d 1, 10-11. Appellant's burden is to demonstrate that the inclusion of the testimony would have caused the court or fact finder to reach a different conclusion. SeeState v. Powe, 9th Dist. No. 21026, 2002-Ohio-6034, ¶ 72.
 {¶ 45} Although expert testimony may have provided some assistance, such testimony would not have categorically proven that appellant did not commit the alleged actions. Therefore, even if additional testimony from Mary or an expert witness had been presented, the testimony from the girls was still enough to establish appellant's guilt. As we noted, the six month delay between the alleged incidents and the disclosure to Mary and a ten month delay between the incidents and testimony at trial could account for some changes in memory. Slight discrepancies in testimony do not automatically demonstrate that the girls were lying. Thus, appellant has not proven that, but for his counsel's actions, the result of the case would have been different and has failed to establish that his counsel was ineffective.
 {¶ 46} Accordingly, appellant's third assignment of error is not well-taken.
 {¶ 47} The judgment of the Ottawa County Court of Common Pleas, Juvenile Division is affirmed. Court costs of this appeal are assessed to appellant pursuant to App. R. 24.
Judgment affirmed.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Singer, P.J., Concur.
[1] Names of witnesses have been changed to protect their privacy.