[Cite as *State v. Barnhart*, 2024-Ohio-547.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
MEIGS COUNTY

STATE OF OHIO,                          :

    Plaintiff-Appellant,            : CASE NO. 22CA13

    v.                              :

ANGELA BARNHART,                        : DECISION AND JUDGMENT ENTRY

    Defendant-Appellee.             :

_____

APPEARANCES:

James K. Stanley, Meigs County Prosecuting Attorney, Pomeroy, Ohio, for appellant.

James S. Sweeney, Powell, Ohio, for appellee.
_____
CRIMINAL APPEAL FROM COMMON PLEAS COURT
DATE JOURNALIZED:2-8-24
ABELE, J.

{¶1} This is an appeal from a Meigs County Common Pleas Court judgment that granted a motion to suppress statements that Angela Barnhart, defendant below and appellee herein, made to police. The State of Ohio, plaintiff below and appellant herein, assigns one error for review:

> "THE TRIAL COURT COMMITTED ERROR WHEN IT
> GRANTED DEFENDANT'S MOTION TO SUPPRESS."

{¶2} In August 2019, a Meigs County Grand Jury returned a one-count indictment that charged appellee with one count of complicity to burglary in violation of R.C. 2911.12(A)(2), a second-degree

felony.  Appellee pleaded not guilty.

{¶3}  On November 7, 2022, appellee filed a motion to suppress her oral statements.  At the hearing on the motion, Meigs County Sheriff's Department Sergeant Frank Stewart testified that on June 8, 2019, he responded to a burglary to collect DNA samples and fingerprints.  The victims provided Stewart with a list of stolen items that included a credit card.  Stewart later contacted the bank and learned that someone used the stolen card in Athens.  Subsequently, the Sheriff's Department posted the bank video on social media, and a citizen identified Jacob White and Angela Barnhart.  Stewart discovered that the pair resided at White's mother's home, approximately one mile from the victim's residence.

{¶4}  After appellee's July 21, 2019 arrest, "multiple interviews" occurred, including at least one interview at the Meigs County Sheriff's Office.  However, the interviews that are the subject of this motion to suppress occurred at the Middleport Police Department, where Sgt. Stewart took a DNA sample from appellee and made an audio recording of the interview.

{¶5}  At the suppression hearing, the state played portions of the recording.  Initially, appellee states, "I mean, I fu*ked up, I did."  Sgt. Stewart states, "It's Sunday, July 21st 5:53 p.m. and we are at the Middleport Police Department.  She is consenting to a DNA swab in reference to a burglary on Burlingham Road."  Appellee replies, "Yes."  While Stewart completes the DNA swab form,

appellee asks, "can we take these [cuffs] off?  I mean, I'm not going nowhere.  Like I said, I fu*ked up."  Stewart presumably leaves the room for a moment, then returns to assist appellee with the DNA form.  Immediately after, at the recording's 3:05 mark, Stewart states, "If you want to talk to me, we'll do a *Miranda* form and then we'll talk."  Appellee replies, "Why do you have to read me that?"  Stewart responds, "because I'm questioning you about a criminal case that you are still suspected in and if your DNA comes back on this, it could be used against you."  Appellee stated, "Oh, ok, I'm not worried about it."

{¶6}  At that point, Sgt. Stewart leaves the room and states he will leave the recorder on and will "be right back."  Stewart leaves for 1 minute and 20 seconds, and when he returns, appellee initiates the conversation, saying, "You're a sheriff, you're bigger than them guys, can you help me with this?  Cause look, I don't have $500.  Yes, I fu*ked up."  Stewart replies, "didn't you say they were dropping it?"  Appellee states, "well they dropped it because they're supposed to be calling somebody because my other kids' Dad is who supplies this town with meth."  Stewart replies, "who's your other kids' Dad?"  Appellee gives Stewart the name and talks about another burglary that involved an assault.  Stewart says he doesn't know anything about that case.

{¶7}  At 7:07 of the recording, Sgt. Stewart says, "you mentioned something to somebody here about working."  Appellee

replies, "yes, because I want out of this * * * what you and me
talked about, I didn't do."  Stewart informed appellee that he:

> "talked to the director of the task force * * * and
> he's willing to work with you as long as you're honest
> with me.  It kind of puts you in a better spot. * * *
> Let's say for instance you had something to do with
> this burglary.  Or you was there with Jacob, it was
> Jacob's idea, blah blah blah blah, you went in with
> him, I get it, because that's what Jacob is saying
> happened.  So if that's what happened, we would indict
> you and the prosecutor would be willing to work with
> you."

Appellee responded, "On my kids, honest to God, I did not enter
that man's home."  Stewart stated, "Ok.  Were you outside the home
when Jacob did?"  Appellee replied, "No.  I was down the road at my
house * * * which isn't far by his house, which isn't far away, but
I wasn't standing outside."  Stewart stated, "because initially I
thought you told me you drove."  Appellee replied, "No, * * * I
didn't tell you that. * * * The only thing I told you * * * was I
know things.  I think I said I was there with the stuff, like I
know what was there. * * * I wasn't physically at the home.  I
didn't physically go in that man's home.  I didn't physically take
Jacob to that man's home."

{¶8}  At 9:00 minutes into the recording, Sgt. Stewart asked
for appellee's birthday, social security number, contact
information, and advised appellee of her *Miranda* rights. Appellee
signed the Waiver of Rights form at 10:05 of the recording.

{¶9} After her *Miranda* warnings, appellee told Sgt. Stewart that (1) she could not tell him much about the burglary itself, (2) Jacob called her to come and get him at the scene, and (3) she drove to a stop sign near the victim's home and Jacob loaded the vehicle with stolen items. Stewart told appellee that Jacob said he wore gloves at the scene, but appellee did not. Appellee's response was, "DNA it. * * * No, I never went into that man's house. * * * That's the honest to God's truth." Although appellee said people threatened her online regarding talking about the burglary and even threatened to torture her mother, appellee continued to deny entering the victim's home. Appellee did, however, confirm that she picked up Jacob and the stolen items near the victim's home and they drove to Jacob's apartment. Appellee stated that Jacob always said he wanted to "hit that house," and, after the burglary, Jacob told her he "hit the mother load."

{¶10} When Sgt. Stewart asked about the location of the stolen items, appellee stated that Jacob took some of the items to a pawn shop and most of the weapons to drug dealers. Appellee said she could ask Jacob about the items when she talked to him. Appellee also stated that she has "been through the justice system" and "been to prison. * * * I didn't know he was going to do it, but I did know that he did it. But no, I didn't enter that man's home."

{¶11} After Sgt. Stewart informed appellee that she may be charged with misuse of a credit card, he said he did not believe

they would indict her other than for "obstructing."  Stewart then left to inquire whether the task force intended to work with appellee and the tape concludes at 30:55.

{¶12} Sgt. Stewart testified that he "was getting the Miranda form and also getting ready to take a DNA sample," when appellee brought up the subject of her mother's home in Paigeville, a substantial distance from the burglary.  Stewart stated that "in the previous interview * * * at the Sheriff's Office, she had mentioned that she would be willing to buy drugs for the Task Force in exchange for a lesser sentence or lighter sentence or something to that effect.  So I had spoken with * * * Director Bill Gilkey * * * about using her * * * and we was [sic.] talking about that during the interview."  When asked if he had inquired of appellee about this particular case, he said he did not.  Later, Stewart said the appellee maintained that she did not enter the burglarized residence, nor did she take Jacob to the residence.  Stewart did not think he asked appellee a question to prompt that information.

{¶13} Sgt. Stewart further testified that he asked appellee "several questions" because he wanted to determine "her involvement and then see if we could work with her through the Task Force." However, Stewart testified that in response to his questions appellee did not admit anything.  Stewart asked appellee for her name, birthday, social security number, and contact information to complete the waiver of rights form, which appellee signed.  Stewart

then related that, after he advised appellee of her Miranda rights, she continued to state that she did not go to the scene of the burglary, but believed "Jacob made several trips to the ditch line, which is in front of the residence, uh, by the road, and dumped items off there." Stewart also asked appellee about stolen property, but did not recall the rest of the interview.

{¶14} On cross-examination, Sgt. Stewart conceded that appellee had been in custody in the Middleport Police Department at the time of her interview and had not been advised of her *Miranda* rights until 10 or 11 minutes into the video. Stewart acknowledged that he took the DNA sample before appellee's *Miranda* rights, and conceded that "in one of the interviews she [appellee] was talking about being, um, under the influence." Stewart also agreed that, at some point, he left and then returned and recalled that six or seven minutes into the recording he talked about matters unrelated to the burglary. Stewart did acknowledge that, before he advised appellee of her Miranda rights, he asked "two to three questions" about the incident. Stewart also admitted that he said something to the effect that, if appellee had something to do with the burglary, she would "be in a better spot" if she "worked with us." He also admitted that he told appellee something to the effect that he would "talk to the Prosecutor to see if he would be willing to work with her on that." Finally, Stewart acknowledged that, before he advised appellee of her Miranda rights, he asked "if she was

outside the home."

{¶15} Defense counsel asked Sgt. Stewart if he asked appellee similar questions before and after he advised appellee of her Miranda rights.  Stewart said he discussed appellee's possible cooperation with the investigation, both before and after.  Stewart also acknowledged that he thought appellee initially told him that she drove to the burglary scene.  Counsel stated, "[a]nd these kinds of questions and talking, you know, this was all . . . you had talked to her about the same topics after Miranda, correct?"  Stewart replied, "Correct, yes."  When asked if he remembered telling appellee that any statements she made before the Miranda warnings could be used against her, Stewart replied, "I don't believe I did, no."  When asked if he considered earlier advising appellee of her Miranda rights, Stewart replied, "Um, no, not really, because we were more so in a conversation about her working for the Task Force at that time and then the conversation continued to build, which was what we were trying to do was fill out a Miranda waiver form."  When defense counsel asked, "But * * * the conversation shifted from strictly her on the Task Force * * * working for the Task Force, possible to asking questions about the burglary, correct?"  Stewart replied, "Correct.  The conversation shifted to that, which is why we filled out the Miranda form eleven (11) minutes into the video, once we realized that it was not going to go, uh, in terms of her working for, uh, the Task Force buying

drugs, we filled out the Miranda form."

{¶16} Once again, defense counsel asked Sgt. Stewart to admit that he asked appellee questions about the burglary pre-Miranda, to which Stewart replied, "Yes." Stewart then elaborated, "that was why I reiterated the same questions, once she was actually *mirandized*." Stewart stated that appellee gave the same answers both before and after being advised of her *Miranda* rights. After the interview, appellee remained in custody due to the statements that implicated her and her co-defendant.

{¶17} On re-direct examination, Sgt. Stewart testified that, in response to his first question pre-*Miranda*, appellee stated, "I'm telling you on my kid's life and I * * * I did not enter that man's home." When Stewart asked her if she was outside when Jacob entered the home, appellee answered, no. Appellee stated, "I ran down * * * I was down the road by my house, which isn't far away, but I wasn't standing outside." Stewart inquired, "I thought you told me you didn't drive there, but you were there, but didn't go in the house." Appellee said, "I didn't tell you that."

{¶18} After hearing the evidence, the trial court granted the motion to suppress. The court ordered "[a]ll statements provided to Sgt. Stewart by Defendant on July 21, 2019 are hereby SUPRESSED [sic.] and therefore not to be testified about or offered as evidence before the jury."

{¶19} Pursuant to Crim.R. 12(K), the state filed its appeal to challenge the trial court's order to suppress appellee's statements.

I.

{¶20} In its sole assignment of error, the state asserts that the trial court erred when it granted appellee's motion to suppress.  Specifically, the state contends that (1) the trial court did not cite any legal authority to grant the suppression motion, (2) although the post-warning portion of appellee's interview is an interrogation, the pre-warning portion of the interview was not an interrogation, and (3) appellee's post-warning statement differed from her pre-warning statement, and, therefore, should not be suppressed.

{¶21} In general, "appellate review of a motion to suppress presents a mixed question of law and fact."  *State v. Codeluppi*, 139 Ohio St.3d 165, 2014-Ohio-1574, 10 N.E.3d 691, ¶ 7, citing *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8; *State v. Bennett*, 4th Dist. Pickaway No. 20CA4, 2021-Ohio-937, ¶ 9.  The trial court is in the best position to evaluate witness credibility at a suppression hearing.  *State v. Dunlap,* 73 Ohio St.3d 308, 314, 652 N.E.2d 988 (1995), *State v. Flanders*, 4th Dist. Washington No. 06CA16, 2007-Ohio-503, ¶ 11.  Therefore, we must uphold the trial court's findings of fact if competent, credible evidence in the record supports them.  *Dunlap*, *supra.*

However, we conduct a de novo review of the trial court's application of the law to the facts.  *State v. Roberts*, 110 Ohio St.3d 71, 2006-Ohio-3665, 850 N.E.2d 1168, ¶ 100*, Burnside* at ¶ 8, *State v. Anderson*, 100 Ohio App.3d 688, 691, 654 N.E.2d 1034 (4th Dist.1995).

{¶22} In *Miranda v. Arizona,* 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.E.2d 694 (1966), the United States Supreme Court "established procedural safeguards for securing the privilege against self-incrimination guaranteed by the Fifth Amendment to the United States Constitution."  *Cleveland v. Oles*, 152 Ohio St.3d 1, 2017-Ohio-5834, 92 N.E.3d 810, ¶ 8, *Moran v. Burbine*, 475 U.S. 412, 420, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).  A suspect in police custody "must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be provided for him prior to any questioning if he so desires."  *Miranda* at 479, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶23} *Miranda* safeguards apply "only when one is subjected to custodial interrogation."  *State v. Hoffner*, 102 Ohio St.3d 358, 2004-Ohio-3430, 811 N.E.2d 48, ¶ 26.  "If a suspect provides responses while in custody without having first been informed of his or her *Miranda* rights, the responses may not be admitted at trial as evidence of guilt."  *Oles* at ¶ 9, citing *Miranda* at 479.

After *Miranda* warnings are given and an opportunity to seek counsel afforded, "the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." *Miranda* at 479. Here, the parties agree that appellee was in custody at the time of the police interviews.

{¶24} The state cites *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985) when the court considered whether the Fifth Amendment's Self-Incrimination Clause requires the suppression of a confession, made after *Miranda* warnings and a valid waiver of rights, solely because the police had obtained an earlier voluntary, but unwarned admission. In *Elstad,* the court upheld a post-*Miranda* warning confession that followed a pre-warning admission that an officer solicited while the suspect had been in custody. After police first questioned and obtained admissions from an 18-year-old defendant at his home, later at the police station the defendant waived his *Miranda* rights and made a full, detailed confession. The trial court admitted both confessions into evidence at trial.

{¶25} The *Elstad* court allowed the post-*Miranda* confession to be admitted into evidence. *Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222. The court held that the relevant inquiry is "whether, in fact, the second statement was also voluntarily made." *Id.* at 318. Moreover, the court held that the failure of police to administer *Miranda* warnings does not mean that the statements

received had been coerced, but only that courts will presume the privilege against compulsory self-incrimination has not been intelligently exercised. *Elstad* at 310, citing *New York v. Quarles*, 467 U.S. 649, 654, 104 S.Ct. 2626, 81 L.Ed.2d 550, n. 5; *Miranda v. Arizona*, supra, 384 U.S. at 457. The *Elstad* court observed:

> There is a vast difference between the direct consequences flowing from coercion of a confession by physical violence or other deliberate means calculated to break the suspect's will and the uncertain consequences of disclosure of a "guilty secret" freely given in response to an unwarned but noncoercive question, as in this case.

*Elstad* at 312, 105 S.Ct. 1285, 84 L.Ed.2d 222.

**{¶26}** Thus, *Elstad* held that in any such inquiry, in evaluating the voluntariness of the statements the finder of fact must examine the surrounding circumstances and the entire course of police conduct. *Id.* at 318. Accordingly, the *Elstad* court held that a suspect, who responded to unwarned yet uncoercive questioning, is not disabled from a waiver of rights and a confession after he received the requisite *Miranda* warnings. *Id.*

**{¶27}** On the other side of the spectrum is *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), a more recent case in which the United States Supreme Court considered whether the technique of successive interrogations, first unwarned and then warned, violated a defendant's *Miranda* rights. In *Seibert,* after a police officer questioned the defendant for 30 to 40 minutes

without *Miranda* warnings, the defendant made an admission. After a 20-minute break, the officer returned, administered *Miranda* warnings, obtained a signed waiver and resumed questioning. During the second interrogation, after the officer confronted the defendant with her pre-*Miranda* statements, she repeated her admission. The *Seibert* court referred to this technique as "question first" and stated that "[t]he object of question first is to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643. The court determined that the post-warning statements are inadmissible. *Id.* at 617.

> The threshold issue when interrogators question and warn later is thus whether it would be reasonable to find that in these circumstances the warning could function 'effectively' as *Miranda* requires. Could the warnings effectively advise the suspect that he had a real choice about giving an admissible statement at that juncture? Could they reasonably convey that he could choose to stop talking even if he had talked earlier? For unless the warnings could place a suspect who has just been interrogated in a position to make an informed choice, there is no practical justification for accepting the formal warnings as compliance with *Miranda*, or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment."

*Seibert*, 542 U.S. at 611-612, 135 S.Ct. 2601, 159 L.Ed.2d 643.

{¶28} Two years after *Seibert,* the Supreme Court of Ohio observed that "*Elstad* and *Seibert* stand on opposite sides of the

line defining where pre-warning statements irretrievably affect post-warning statements.  Still, that line cannot be said to be bright or sharply defined." *State v. Farris*, 109 Ohio St.3d 519, 2006-Ohio-3255, 849 N.E.2d 985, ¶ 22.

{¶29} During a routine traffic stop in *Farris*, an officer smelled marijuana and ordered the defendant to exit his vehicle. Without administering *Miranda* warnings, the officer asked the defendant about the smell of marijuana.  The defendant stated that his roommates smoked marijuana when he left the house.  When the officer told the defendant that he intended to search the car and asked about drugs in the car, the defendant admitted that a marijuana pipe could be found in the trunk. *Id.* at ¶ 3.  The officer then administered *Miranda* warnings, but did not tell the defendant that previous admissions could not be used against him. The officer then asked the same questions and obtained the same responses regarding the location of the drug paraphernalia.  *Id.* at ¶ 4.  After the trial court ruled that statements prior to the *Miranda* warnings must be suppressed, but statements after the warnings would be admitted into evidence, the defendant entered a no-contest plea and appealed.

{¶30} The Supreme Court of Ohio observed that no talismanic incantation is required to satisfy *Miranda, California v. Prysock*, 453 U.S. 355, 359, 101 S.Ct. 2806, 69 L.Ed.2d 696 (1981).  Instead,

the inquiry is simply whether the warnings reasonably convey to a suspect his or her rights as *Miranda* requires. *Farris* at ¶ 18, quoting *Seibert*, 542 U.S. at 611, 124 S.Ct. 2601, 159 L.Ed.2d 643. *Farris* emphasized, however, that *Seibert's* admonition that in the "question first" scenarios, when circumstances show that the *Miranda* warning could not reasonably be found effective, the post-warning statements are inadmissible because "earlier and later statements are realistically seen as parts of a single, unwarned sequence of questioning." *Farris* at ¶ 21, quoting *Seibert* at 612, 124 S.Ct. 2601, 159 L.Ed.2d 543, fn. 5. *Farris* also pointed out that *Elstad* and *Seibert* establish factors to consider in deciding whether sequential interrogations are essentially one continuous interrogation, and whether an intermediate *Miranda* warning can be effective. The court quoted *Seibert*:

> "The contrast between *Elstad* and this case reveals a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: [1] the completeness and detail of the questions and answers in the first round of interrogation, [2] the overlapping content of the two statements, [3] the timing and setting of the first and the second, [4] the continuity of police personnel, and [5] the degree to which the interrogator's questions treated the second round as continuous with the first. In *Elstad*, it was not unreasonable to see the occasion for questioning at the station house as presenting a markedly different experience from the short conversation at home; since a reasonable person in the suspect's shoes could have seen the station house questioning as a new and distinct experience, the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission.

At the opposite extreme are the facts here, which by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings. The unwarned interrogation was conducted in the station house, and the questioning was systematic, exhaustive, and managed with psychological skill. When the police were finished there was little, if anything, of incriminating potential left unsaid. The warned phase of questioning proceeded after a pause of only 15 to 20 minutes, in the same place as the unwarned segment. When the same officer who had conducted the first phase recited the *Miranda* warnings, he said nothing to counter the probable misimpression that the advice that anything Seibert said could be used against her also applied to the details of the inculpatory statement previously elicited. In particular, the police did not advise that her prior statement could not be used. Nothing was said or done to dispel the oddity of warning about legal rights to silence and counsel right after the police had led her through a systematic interrogation, and any uncertainty on her part about a right to stop talking about matters previously discussed would only have been aggravated by the way [the officer] set the scene by saying 'we've been talking for a little while about what happened on Wednesday the twelfth, haven't' we?' * * * The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given. It would have been reasonable to regard the two sessions as parts of a continuum, in which it would have been unnatural to refuse to repeat at the second stage what had been said before. These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk."

*Farris, supra,* at ¶ 28-29, quoting *Seibert,* at 615-617, 124 S.Ct. 2601, 159 L.Ed.2d 643.

{¶31} The *Farris* court concluded that the defendant's interrogation resembled *Seibert* more than *Elstad*, and noted: (1) although the whole process was extremely brief, it would have been

reasonable to regard the two sessions as part of a continuum, (2) although the questioning was very simple, not in-depth, and not lengthy, it covered exactly the same subject both before the warning and after the warning, and (3) both statements were made in the police cruiser to the same officer within moments of each other. *Id.* at ¶ 30. Accordingly, the court held that temporally and substantively, the questioning constituted a single interrogation. *Id.* at ¶ 31.

{¶32} The *Farris* court also noted that, unlike *Seibert*, the police employed no official strategy to intentionally bait the suspect into talking before the *Miranda* warnings, then repeat the damaging statements post-warning. However, *Farris* concluded that *Seibert* left unclear whether the officer's intent is relevant in the *Miranda* analysis. Thus, the Supreme Court of Ohio determined that the suspect's state of mind is key. *Id.* at ¶ 35. Accordingly, *Farris* held, "[b]ecause the intent of the trooper was irrelevant here, and because Farris's post-warning statements were the same as his pre-warning statements, we hold that Farris's post-warning statements were not the result of an informed choice and are therefore inadmissible." *Id.* at ¶ 36.

{¶33} In the case sub judice, we presume from the trial court's judgment that it granted appellee's suppression motion based on

*Seibert* and *Farris*.[1]  The entry states:

> This matter came on for hearing November 29, 2022 on the Defendant's Motion to Suppress.  Present in court was the Defendant, Angela Barnhart, her attorney, James S. Sweeney, and the Assistant Prosecuting Attorney, Jeff Adkins.
>
> Defendant was taken into custody by the Meigs County Sheriff's Department on July 21, 2019.  Sgt. Stewart communicated and asked questions of Defendant while in custody and prior to advising Defendant of her constitutional rights under Miranda.
>
> The Miranda warnings were eventually given to the Defendant by Sgt. Stewart.  After the Miranda advisement, additional questions were asked of Defendant, including questions covering topics discussed prior to the reading of her Miranda rights.
>
> All statements provided to Sgt. Stewart by Defendant on July 21, 2019 are hereby SUPRESSED [sic.] and therefore not to be testified about or offered as evidence before the jury.

{¶34} Although the interview process was relatively brief, it is reasonable to regard the two sessions as part of a continuum. We note that Sgt. Stewart indicated that they conducted "multiple interviews" with appellee, and "in one of the interviews [appellee] was talking about being * * * under the influence."  Further, although Stewart first mentioned a *Miranda* waiver at 3:05 of the

---

[1] The state observed that the trial court's entry did not cite authority.  However, a trial court's failure to cite to authority or precedent in its opinion does not necessarily affect an appellate court's ability to examine the issues presented on appeal.  *See Green v. Administrator, Ohio Bureau of Workers' Compensation*, 4th Dist. Gallia No. 17CA17, 2018-Ohio-2618, ¶ 18.

recording, he did not administer the warnings until 10:05 of the 30:55 minute recording. Second, like *Farris,* although the questions in the case at bar appear to be simple and not lengthy, the questions both before and after the warnings covered the same subject and involved the same officer at the same location.

{¶35} The state also contends that appellee's post-warning statement differed from her pre-warning statement because the post-warning statement made criminally culpable admissions, whereas the pre-warning statement denied criminal culpability. We disagree, however. In appellee's pre-warning statement, she admitted she was "there with the stuff" and stated, "I know things * * * like, I know what was there." Both the pre-warning and post-warning statements implicated appellee in the burglary.

{¶36} Moreover, applying the *Seibert* factors to the case sub judice, the only factor that weighs in the state's favor is the first - the completeness and detail of the questions and answers in the first round of interrogation. Regarding the other factors, overlapping content exists in the two statements, the timing between the two statements was virtually simultaneous, in the same setting with the same officer, and the questions treated the second round as continuous with the first. Thus, we agree with the trial court's conclusion that the *Seibert* factors weigh in favor of suppression.

{¶37} The state cites *State v. Dixon*, 101 Ohio St.3d 328, 2004-Ohio-1585, 805 N.E.2d 1042, in support of its argument that appellee's pre-warning statement was not inculpatory. In *Dixon,* police interviewed the defendant three times and the parties did not dispute that the trial court properly suppressed the defendant's second interview statements. In concluding that the other two interviews were admissible, the Supreme Court of Ohio relied on *Elstad*, observed that four hours elapsed between sessions two and three, and concluded that the breach of the *Miranda* procedures involved no actual compulsion, promises, or coercive tactics. *Id.* at ¶ 26, 34. Although we discern no evidence of compulsion or coercive tactics in the case at bar, we believe *Dixon* is distinguishable. *Dixon* involved a long break between the interviews and, more importantly, the court decided *Dixon* two months before *Seibert* and two years before *Farris*. Thus, we believe *Dixon* has limited precedential value.

{¶38} In *State v. Jirac*, 2d Dist. Montgomery No. 15-CR-756, 2016-Ohio-8187, the defendant's initial encounter with police at a UPS store resulted in a custodial interrogation before any *Miranda* rights discussion. The same officer conducted both pre- and post-*Miranda* interviews, and the interrogator treated the second interrogation as continuous with the first by asserting at the outset that the post-warning interrogation was designed to review

the previous discussion and clarify discrepancies in the two statements by asking the defendant to affirm the specific statements he made during the first interrogation. The Second District concluded that a defendant in similar circumstances reasonably would not believe that, after being given a *Miranda* warning, he had any choice but to affirm the statements already made to police before that warning. The court concluded that the statements were inadmissible because the defendant's post-warning statements did not result from an informed, voluntary choice to waive his rights,. *Id.* at ¶ 15.

{¶39} In *State v. Cook,* 2d Dist. Montgomery No. 24524, 2012-Ohio-111, the defendant's pre-*Miranda* interview lasted approximately five minutes, then, shortly thereafter, the police transported the defendant to a building for a second interrogation. Before the second interrogation, the same officer advised the defendant of her *Miranda* rights. The officer testified that the second interview, substantially longer than the first, covered the same event, but "started at the beginning and went through to the end." *Id.* at ¶ 17. The Second District concluded that the case "fell on the *Seibert* side of the *Elstad/Seibert* continuum" because the content overlapped, the same officer elicited both statements, and the interviews were designed to elicit incriminating statements. *Id.* at ¶ 29.

{¶40} Similarly, in *State v. Bonnell*, 5th Dist. Delaware No. 07CAA 01 0006, 2008-Ohio-28, when officers at a rest area checked a vehicle's license plates and ran the defendant's license, they learned that a rental company had reported the vehicle stolen. When an officer patted down and handcuffed the defendant and then attempted to confirm ownership, the officer asked if the defendant owned the vehicle. The defendant told him the vehicle was a rental car. When the officer asked if he knew why he had been detained, the defendant responded that the rental car was overdue for several months. *Id.* at ¶ 6. Officers then placed the defendant in their cruiser while they awaited confirmation about the vehicle's status.

{¶41} After confirming that the vehicle had been stolen, officers advised the defendant of his *Miranda* rights. At that point, the defendant admitted that three months before he signed a two week rental agreement. The trial court suppressed the defendant's statements made before officers placed him in the cruiser and advised him of his *Miranda* rights, but allowed the statements made post-*Miranda.* *Id.* at ¶ 7.

{¶42} On appeal, the Fifth District reversed and held that the trial court should have suppressed statements made after the defendant had been advised of his *Miranda* rights.

> The statements were close in time to the statements appellant made prior to being given *Miranda* warnings, were elicited by the same deputy and overlapped in content with

> his earlier, pre-*Miranda* statements. * * * [B]oth the pre and post-*Miranda* interrogations concerned whether appellant had permission to use the vehicle and whether it was overdue. While the first interrogation occurred outside of Deputy Pollock's cruiser, the second occurred just minutes later while appellant was seated in the back of the cruiser. * * * [Thus], the court found that the 'mid-stream' *Miranda* warnings in this case were not effective enough to accomplish their objectives and that the trial court, therefore, erred in not granting appellant's Motion to Suppress appellant's statements.

*Id.* at ¶ 52.

**{¶43}** In the case sub judice, the state argues that the appellee offered some unsolicited statements and because an unsolicited and spontaneous statement is not the product of interrogation, *Miranda* does not apply. *State v. Neyland*, 139 Ohio St.3d 353, 2014-Ohio-1914, 12 N.E.3d 1112, ¶ 119. We may agree that arguably some statements, like the first statement pre-*Miranda* "I mean, I fu*ked up, I did," and later statement after Sgt. Stewart reentered the room, "You're a sheriff, you're bigger than them guys, can you help me with this? Cause look, I don't have $500. Yes, I fu*ked up," are examples of unsolicited and spontaneous statements, the appellee gave several statements in response to questions, such as "Were you outside the home when Jacob did [the robbery]?" and "because initially I thought you told me you drove." Those questions clearly pertained to the burglary. Further, Stewart's statement at the suppression hearing reveals that he asked appellee "several questions" because he attempted to

determine "her involvement and then see if we could work with her through the Task Force." When asked if he posed similar questions before and after *Miranda*, Stewart replied, "Correct, yes."

{¶44} Accordingly, based on *Farris* and *Seibert,* we conclude that the trial court did not err in its decision to suppress all statements appellee provided to Sgt. Stewart on July 21, 2019. Therefore, for all of the foregoing reasons, we affirm the trial court's judgment.

JUDGMENT AFFIRMED.

JUDGMENT ENTRY

It is ordered that the judgment be affirmed and appellant bear the costs herein taxed.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Meigs County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute that mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. & Hess, J.: Concur in Judgment & Opinion

For the Court

BY:_____
                              Peter B. Abele, Judge

NOTICE TO COUNSEL

Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.